## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| JEFFREY A. PLANCHARD, M.D. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **CASE NO.:** |
| | ) | |
| USA HEALTHCARE MANAGEMENT, | ) | **JURY DEMAND** |
| LLC, and USA HEALTH, | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT

**COMES NOW** JEFFREY A. PLANCHARD, M.D., by and through his

attorneys Deborah A. Mann and Christine Hernandez of the Hernandez &

Associates Firm, LLC, and hereby complains against Defendants USA

HEALTHCARE MANAGEMENT, LLC and USA HEALTH as follows:

### NATURE OF THE CASE

This is an action to recover damages under 42 U.S.C. §§ 2000e et. seq. (Title

VII) and 42 U.S.C. § 1981 for race and religious discrimination suffered by

Plaintiff while employed by Defendants, which ultimately led to his wrongful

termination and "black-balling" in the local medical community and for various

state remedies arising therefrom.

## PARTIES

1. Plaintiff JEFFREY A. PLANCHARD, M.D. is a citizen of Alabama and lives in Mobile, Alabama. Prior to the wrongful termination of his employment, Plaintiff worked as an anesthesiologist for Defendants USA HEALTHCARE MANAGEMENT, LLC and USA HEALTH.

2. Defendant USA HEALTHCARE MANAGEMENT, LLC is an affiliate and integral part of the University of South Alabama, created exclusively to support the educational, research and clinical functions of the University of South Alabama in service to its academic medical school and its hospitals and clinics and is principally located and doing business in Mobile, Alabama. Plaintiff is informed and believes Defendant employs in excess of 500 people.

3. Defendant USA HEALTH operates for the purpose of promoting the public health mission of the University of South Alabama, which includes owning and operating medical clinics and other healthcare facilities, including the University Hospital, providing inpatient and outpatient care for patients in need of professional medical care and is principally located and doing business in Mobile, Alabama. Plaintiff is informed and believes Defendant employs in excess of 500 people.

## JURISDICTION AND VENUE

4.  This action to redress the deprivation of Plaintiff's civil rights arises under the laws of the United States, specifically 42 U.S.C. § 2000e, *et. seq.* and 42 U.S.C. § 1981. This court has jurisdiction to hear the subject matter of this case pursuant to 28 U.S.C. §§ 1331 and 1343.

5.  This court has federal supplemental jurisdiction to hear the subject matter of the included state law claims which are part of the same case or controversy and arise from the same facts, or involve similar occurrences, witnesses or evidence pursuant to 28 U.S.C. § 1367.

6.  The events described in this action predominantly occurred in Mobile, Alabama. This court is the proper venue for this action pursuant to 28 U.S.C. § 1391(b).

## FACTS SUPPORTING CLAIMS

7.  Plaintiff JEFFREY PLANCHARD, M.D. ("Dr. PLANCHARD") is genetically part of an "ethnically and physiognomically distinctive subgrouping of *homo sapiens*" in that he was born a Jew to a 100% Jewish mother, was raised in the Jewish faith and identifies as a Hebrew.

8.  Dr. PLANCHARD is a highly skilled Anesthesiologist.

9. In addition to working full time as an anesthesiologist at Springhill Hospital in 2020, Dr. PLANCHARD also worked as a traveling LocumsTenes.com anesthesiologist during his time off.

10. Taylor Young of LocumTenes.com presented Dr. PLANCHARD's CV to Defendants on or about December 3, 2020, as a potential anesthesiologist locum tenens candidate.

11. In December of 2020, Defendants did not have a sufficient number of anesthesiologists on staff at USA Hospital.

12. Locum tenens anesthesiologists cost hospitals more money than full time hospital staff anesthesiologists.

13. On or about December 3, 2020, Defendants, though their agent Andrew Price, Administrator with USA Health, began recruiting Dr. PLANCHARD on behalf of Defendants for a full-time staff anesthesiologist position at USA Hospital.

14. As an inducement for Dr. PLANCHARD to accept employment with Defendants USA HEALTHCARE MANAGEMENT, LLC, ("USA HEALTHCARE") and USA HEALTH, Defendants suggested Dr. PLANCHARD could restart the long dormant Anesthesiology Residency program at USA.

15.  On or about December 3, 2020, Plaintiff Dr. PLANCHARD spoke on the telephone with USA Hospital chief of anesthesiology D. Wade Hutchens, M.D. for over an hour about the prospect of Plaintiff joining Defendants' anesthesiology team.

16.  During their hour-long telephone call, Dr. Hutchens seemed genuinely enthusiastic about Plaintiff joining the anesthesiology team at USA Hospital.

17.  During their lengthy telephone conversation, Defendants' agent Dr. Hutchens agreed that USA Hospital needed a residency program and that he would be happy to help Plaintiff start one if he joined the USA Hospital anesthesiology staff.

18.  During this same telephone conversation, Dr. Hutchens stated he believed Plaintiff Dr. PLANCHARD would be a great fit for USA Hospital.

19.  On or about December 4, 2020, Defendants' agent Mr. Andrew Price called Plaintiff to confirm that he spoke with Dr. Hutchens and to set up an in-person meeting/interview for Plaintiff with Dr. Chang, Defendants' Chief Medical Officer for December 9, 2020.

20.  On or about December 9, 2020, Plaintiff met with and interviewed with Dr. Chang for approximately 2 hours and 50 minutes.  Andrew Price, Administrator for Defendants, D. Wade Hutchens, Chief Anesthesiologist and Dr. Kai Rodning, M.D. were also present.

21.  At the end of his interview on December 9, 2020, Mr. Andrew Price told Plaintiff Dr. PLANCHARD as they walked out to expect a contract offer "prior to the holidays."

22. During his interview on or about December 9, 2020, Plaintiff Dr. PLANCHARD wore a Star of David necklace, signifying his Jewish faith, as he does on all formal occasions.

23.  Throughout his interview the Star of David necklace was open, obvious and readily visible to all present at the interview meeting on December 9, 2020.

24.  Although Dr. Hutchens, Chief Anesthesiologist, had previously been cordial, jovial and friendly towards Plaintiff Dr. PLANCHARD, his entire attitude toward Plaintiff shifted after observing the Star of David necklace at the in-person interview and discovering Plaintiff was Jewish.

25.  Immediately upon discovering that Plaintiff Dr. PLANCHARD was Jewish, Chief Anesthesiologist Dr. Hutchens became standoffish and barely spoke a word to Plaintiff.

26.  Defendants failed to offer Plaintiff a contract by the holidays as represented.

27. Plaintiff is informed and believes Defendants needed to expand their anesthesiology staff at U.S.A. Hospital in December, 2020 and January, 2021.

28. Plaintiff is likewise informed and believes there is a shortage of anesthesiologists in the Mobile, Alabama area.

29. Finally, after several inquiries by Plaintiff Dr. PLANCHARD, in January 2021, Defendants offered Plaintiff a two-month Locum Tenens position at U.S.A. Hospital at the insistence of Dr. Hutchens, rather than the long-term, full-time contract discussed at his interview.

30. During the delay in receiving the promised offer from U.S.A. Hospital, Plaintiff scheduled out of town Locum Tenens work in February and March of 2021.

31. In January of 2021, Chief Anesthesiologist Dr. Hutchens presented Plaintiff Dr. PLANCHARD with an offer letter and a draft contract indicating the contract would be effective for permanent employment after the successful completion of the Locums Tenens assignment with U.S.A. Hospital to the satisfaction of the "Department of Anesthesiology," a legally non-existent entity.

32. The parties eventually agreed Dr. PLANCHARD would work as a Locums Tenens anesthesiologist but would be employed full time upon signing his contract.

33. On February 1, 2021, Dr. PLANCHARD started work at U.S.A. Hospital and was immediately subjected to a hostile workplace because he was Jewish.

34. On February 1, 2021, Plaintiff Dr. PLANCHARD arrived one hour early to work to meet up with his direct supervisor, Dr. Hutchens, and obtain a tour of the facility.

35. Upon seeing Plaintiff, Dr. Hutchens instructed Dr. PLANCHARD to "only document standard work hours, as overtime was discouraged" and "not all of us are about the money." The stereotypical Jew is only "about the money."

36. When Plaintiff Dr. PLANCHARD specifically asked for assistance with the computer system, Dr. Hutchens, Plaintiff's direct supervisor, responded with grunts, declined to assist Dr. PLANCHARD and left the room.

37. Medical Director Dr. Kai Rodning assisted Dr. PLANCHARD with the instruction and implementation of the computer system education and training needed for the job when Dr. Hutchens refused to do it.

38. At all times Dr. Hutchens was openly and publicly rude, condescending and intentionally abrasive toward Plaintiff with Defendants' acquiescence.

39. Plaintiff's direct supervisor Dr. Hutchens continually rebuffed Plaintiff creating an ongoing hostile workplace simply because Plaintiff was Jewish. For example, when Plaintiff Dr. PLANCHARD would join Dr. Hutchens in the lounge at lunch, Dr. Hutchens would disengage from conversation at Plaintiff's arrival and would move to a separate table in the room and eat elsewhere.

40. One time when Dr. PLANCHARD was sharing his 23 and Me Jewish Ancestry DNA information with Dr. Rodgrigo, Dr. Hutchens interrupted the conversation appearing visibly disgusted and ordered Plaintiff Dr. PLANCHARD to report to the OR and start an anesthetic on a case.

41. Dr. Hutchens' directive was ultimately determined to be about a case that had already begun with another anesthesiologist.

42. Plaintiff was not needed nor assigned to this case, which had already been going for approximately 30 minutes.

43. On or about February 15, 2021, Plaintiff Dr. PLANCHARD overheard his supervisor Dr. Hutchens and CRNA Chuck Musselwhite loudly discussing Dr. PLANCHARD's employment status.

44. Dr. Hutchens informed the CRNA that Mr. Andrew Price, Defendants' administrator, told Dr. Hutchens that U.S.A. Hospital was going to hire Plaintiff "so long as he wasn't an unmitigated disaster."

45. Plaintiff's supervisor Dr. Hutchens, who was close to retirement age at the time, followed up his first comment by loudly stating that this was "an awfully low bar for the KIKE they hire to replace me."

46. "KIKE" is a derogatory and humiliating term for a Jewish person.

47. Although Plaintiff felt humiliated being publicly labeled a "KIKE" by his supervisor to a co-worker for anyone near to hear, Dr. Hutchens and CRNA Chuck Musselwhite found humor in the derogatory commentary about Plaintiff Dr. PLANCHARD's race and religion.

48. On another occasion, Plaintiff remarked that a pre-op patient was so thin she looked like she had just escaped from a concentration camp. CRNA Mike Tomlinson, who knew Plaintiff was Jewish asked, "Why? Does she have a big nose?"

49. Negative stereotypes of Jews portray them with oversized noses.

50. CRNA Mike Tomlinson, with Defendants' acquiescence repeatedly mocked Plaintiff Dr. PLANCHARD telling him he only made it to medical school because he "inherited Jew gold."

51. Another U.S.A. Hospital anesthesiologist Dr. Aston Archibald, often derided Plaintiff and his accomplishments merely because he was Jewish.

52. For example, in February of 2021, Dr. Archibald told Dr. PLANCHARD "Your people have had incredible success in our country despite being few in number. Jews look out for each other and make sure you all get a leg up."

53. Dr. Archibald later told a group of doctors and CRNA's in front of Plaintiff, that the Italian mafia "never killed their own, that's the movies. They'd hire Jews as their assassins. Look it up. Jews are some of the most cold-blooded killers around."

54. Suggesting that an anesthesiologist, a doctor that literally bears responsibility for the life of a patient during surgery, belongs to a group of "cold-blooded killers" is insulting and horrifying.

55. Plaintiff Dr. PLANCHARD felt humiliated when one of his coworkers suggested he belonged to a group of cold-blooded killers.

56. Dr. Hutchens, Plaintiff's direct supervisor, regularly undermined Dr. PLANCHARD's decision making and negatively commented on his employment for no reason other than his religion and race/ethnicity.

57. Throughout the month of February, Plaintiff asked Mr. Price about the status of the permanent contract. Each time, Mr. Price deferred to the judgment of Dr. Hutchens, who said he wanted every faculty member to meet Dr. PLANCHARD, despite that Dr. Hutchens' requirement was not normal procedure.

58. Despite stating that he wanted Plaintiff to meet the other faculty members, Dr. Hutchens declined to assist in introductions and continually made inappropriate antisemitic and other disparaging comments to and about Dr. PLANCHARD.

59. In February of 2021, in an effort to understand the delay with his permanent contract, Plaintiff asked Mr. Andrew Price if there had been any negative feedback received from the faculty, to which Mr. Price responded "none."

60. When Plaintiff then asked Mr. Price why his employment had to be unanimous, Mr. Price inquired if Dr. PLANCHARD felt discriminated against.

61. Although Dr. PLANCHARD did believe he was being discriminated against, he believed a positive response would have a negative impact on his employment so he instead sidestepped the question and merely inquired about the delay.

62. Defendants at all times ratified the discriminatory treatment of Plaintiff Dr. PLANCHARD which they knew or should have known about.

63. After Dr. Saroj Shah, the only Indian member of the Anesthesiology division at U.S.A. Hospital, had to leave the country for several weeks due to a death in the family, Plaintiff was assigned to cover Dr. Shah's usual role

as anesthesiologist for outpatient endoscopy two floors up from the rest of the ORs, which was akin to exile and intended to demean Plaintiff to the staff.

64. Dr. Hutchens remarked that Dr. Shah had been assigned outpatient endoscopy because "she was not qualified to cover anything more difficult."

65. Dr. Hutchens suggested Dr. PLANCHARD, who trained at the prestigious Cleveland Clinic, was no more qualified than he believed Dr. Shah to be, despite that Plaintiff was the only member of the staff certified in echocardiography, and the only main campus physician so trained.

66. On or about February 28, 2021, when Plaintiff approached Dr. Hutchens to work out the details of leaving for his pre-existing and higher paying Weatherby short term employment commitment during the last two weeks of March, Dr. Hutchens immediately offered Plaintiff his permanent contract and made it effective as of the same date.

67. Mr. Price agreed to the permanent contract but insisted that it would be given in exchange for Plaintiff canceling the March Weatherby assignment knowing Plaintiff did not have the minimum 30 days required to cancel.

68. In reliance on the offer of permanent employment and believing he had no other option, Plaintiff Dr. PLANCHARD canceled the other Weatherby

assignment without the required 30 days' notice, which negatively impacted his relationship with the other hospital.

69.  The parties entered into an employment contract which by its terms became effective on February 28, 2021.

70.  Paragraph 5.2 of the contract provided terms under which Defendants could immediately terminate Plaintiff, notice of which would be given in writing.

71.  Terms pertaining to immediate termination involved egregious conduct by the physician such license loss or loss of ability to work with private and government insurance systems.

72.  Termination for cause, pursuant to paragraph 5.3 of the contract, required written notice of intent to terminate citing the grounds therefor and required a reasonable period of time to remediate the "cause", not to exceed 30 days.

73.  Defendants reserved the right to terminate Plaintiff Dr. PLANCHARD without cause upon at least ninety days advance written notice in paragraph 5.4.

74.  Paragraph 5.5 of the contract provided any termination of Plaintiff would be done in consultation with the Supervisor and the Chief Medical Officer (Dr. Chang).

75.  A short time after executing his permanent contract in February of 2021, Plaintiff had the opportunity to converse with Dr. Joseph Rodrigo, one of the

anesthesiologists at U.S.A. Hospital who had been a medical director in South Carolina.

76. Dr. PLANCHARD asked if Dr. Rodrigo had ever had to fire anyone. Dr. Rodrigo replied only once. Plaintiff asked if it was "drugs" but Dr. Rodrigo responded, "Oh no, not that. He was a great clinician. It's just his personality. He was argumentative, loud, neurotic. He was a Jewish guy. You know how they can be. Well, no one liked him, and administration was looking for a reason."

77. Upon hearing Dr. Rodrigo's comment, Plaintiff began to understand the extent to which antisemitism pervaded the U.S.A. Hospital system.

78. During his entire tenure with U.S.A. Hospital, Plaintiff Dr. PLANCHARD received only positive feedback.

79. On or about March 24, 2021, Plaintiff received a telephone call offering him the chance to interview for a position at Providence Hospital with a minimum starting salary of $420,000.

80. Plaintiff Dr. PLANCHARD declined to interview because he was under contract with and committed to his job with Defendants.

81. On or about March 26, 2021, Mr. Price told Dr. PLANCHARD verbally during a telephone call that he could cancel his Marketplace health insurance as his full-time benefits would start April 1, 2021.

82. During that same telephone call on March 26, 2021, Mr. Price told Plaintiff he had received no negative feedback or complaints from staff about Dr. PLANCHARD.

83. In response to an email, on March 26, 2021, Mr. Andrew Price told Plaintiff that although it was too late for 2021, Defendants would put Plaintiff on the list to pay Dr. PLANCHARD's Society dues "for next year."

84. Based on the given feedback, Plaintiff felt comfortable enough on March 29, 2021, to ask Mr. Andrew Price for proof of income for a mortgage application.

85. The very next day on March 30, 2021, Mr. Price, Director of Anesthesia, summoned Plaintiff Dr. PLANCHARD to his office.

86. Dr. Wade Hutchens was present in Mr. Price's office when Plaintiff arrived.

87. Despite being scheduled to work full time hours throughout the month of April, Dr. Hutchens and Mr. Price informed Plaintiff that day, March 30, 2021, would be his last day and they immediately collected his badge.

88. Dr. Hutchens and Mr. Price then simply stated Plaintiff Dr. PLANCHARD was a "poor fit for the hospital."

89. Dr. Hutchens and Mr. Price failed to comply with the terms of Plaintiff's contract which required any termination without cause to be in writing with 90 days' notice.

90. Plaintiff's contract further required that CMO Dr. Chang be consulted about any termination.

91. When Plaintiff Dr. PLANCHARD inquired as to whom Dr. Hutchens and Mr. Price had consulted about his termination, Dr. Hutchens responded, "those people in Administration who make such decisions."

92. When Plaintiff inquired whether Dr. Chang had been consulted, Dr. Hutchens replied, laughing, "You're welcome to call him."

93. When Plaintiff later contacted Dr. Chang, Dr. Chang confirmed he had not been consulted as he was out of town due to a death in the family.

94. Failure to confer with Dr. Chang about termination was a violation of hospital procedure and Plaintiff's contract.

95. Plaintiff was so shocked, upset and caught off guard by the treatment and lack of professionalism of these two superiors that he began to cry, stating he had a family to support and they needed the benefits he had been told to cancel just days before in reliance upon Mr. Price's promise that his U.S.A. Heath benefits would start April 1, 2021.

96.  Dr. Hutchens openly mocked and ridiculed Plaintiff Dr. PLANCHARD
     pointing at Plaintiff while looking at Mr. Price and laughing, stating, "Be an
     adult!" and "Look at him, Andy, he has no insight at all!"

97.  At all times relevant thereto, Mr. Price, Director of Anesthesiology and
     Administrator for Defendants condoned Dr. Hutchens' conduct.

98.  "Insight" is a term used in psychiatry for knowledge of one's condition.

99.  Dr. Hutchens used the term "insight" in a derogatory manner directed
     toward Plaintiff, laughing, demonstrating the intent to demean and humiliate
     Plaintiff Dr. PLANCHARD.

100.    When Plaintiff asked what he meant by insight, Dr. Hutchens
     responded that "no one in this hospital has a positive opinion of you,"
     despite that Plaintiff has childhood friends and colleagues who work in the
     hospital who remain friendly.

101.    Dr. Hutchens' comment directly contradicted the feedback Plaintiff
     had previously received from Mr. Price.

102.    Dr. Hutchens further stated, without rational basis, that he couldn't
     trust Plaintiff Dr. PLANCHARD to take calls by himself at night despite that
     no incidents related to Plaintiff's medical judgment had been mentioned.

103.    At this point in time, no statements, incidents or error, or any other
     communications were made to Plaintiff Dr. PLANCHARD in regard to any

issue related to his performance, there had been no performance review, there had been no write up, there had been no negative reports of which Dr PLANCHARD had been made aware throughout either Plaintiff's temporary period or after he accepted his permanent contract.

104.    Dr. Hutchens' comments were so outlandish considering Plaintiff is a Board-Certified Anesthesiologist who had taken night call every five days during his prior three years at Springhill Hospital and had trained at the Cleveland Clinic without issue.

105.    At all times Plaintiff believed Dr. Hutchens could only have intended his comments, which contradicted everything Plaintiff had been told to date, as public insults.

106.    Throughout the March 30, 2021, meeting, Dr. Hutchens, with the approval of Mr. Price, continued to laugh at and mock Dr. PLANCHARD's tears and Plaintiff's goal to restart the residency program.

107.    After being outrageously mocked and humiliated, Plaintiff was told the meeting was over and while he prepared to leave, apparently not quickly enough, Dr. Hutchens continued to laugh and mock stating, "I'd hate to have to call security."

108.     Believing his treatment to be the product of racial and religious discrimination, especially from his direct supervisor Dr. Hutchens, Plaintiff Dr. PLANCHARD wrestled with the idea of making a report.

109.     At all times Plaintiff suspected reporting the discrimination he had faced would be futile since Dr. Hutchens seemed to talk for Defendants and attended every meeting involving Dr. PLANCHARD.

110.     Plaintiff finally overcame the intimidation he felt and on March 31, 2021, Dr. PLANCHARD told Mr. Price that he had been a victim of widespread discrimination.

111.     While  Mr. Price indicated Defendants took complaints of discrimination seriously, rather than making an effort to investigate, Mr. Price said he would set up a meeting, which would include Defendants' attorney.

112.     Believing he should not attend any meetings with Defendants' counsel present unless he was also represented, Dr. PLANCHARD declined to attend.

113.     On or about April 1, 2021, Mr. Price verbally confirmed to Plaintiff Dr. PLANCHARD that he was going to be terminated without cause as a "poor fit".

114.    In response, Dr. PLANCHARD requested the written 90-day notice guaranteed by his employment contract which had an effective date of February 28, 2021.

115.    In retaliation for Plaintiff opposing Defendants' unlawful employment practice, i.e. discrimination, complaining about discrimination to Mr. Price and requesting Defendants follow their own procedure and Plaintiff's rights pursuant to his contract, Defendants made false and defamatory statements about Plaintiff.

116.    Defendants falsely accused Plaintiff of being bipolar,.

117.    Defendants told Paul Hude, a CRNA who had worked with Dr. PLANCHARD at both Springhill Hospital and at U.S.A. Hospital and who had been out of town when Defendants terminated Plaintiff that Plaintiff was bipolar as justification for terminating him.

118.    Defendants falsely reported to Adam Mason, DO, an anesthesiologist at Mobile Infirmary and Plaintiff's former supervisor at Springhill that Dr. PLANCHARD was removed from U.S.A. Hospital by security.

119.    Most damaging of all, Defendants sent out false and defamatory letters to the three companies that collectively held Dr. PLANCHARD's hospital privileges elsewhere.

120.    LocumTenens.com, the agency that was paying but not employing Dr. PLANCHARD on March 30, 2021, was falsely informed, among other false accusations, that Plaintiff had given blood to a Jehovah's Witness patient.

121.    Plaintiff is informed and believes Defendants sent similar letters to CHG Healthcare, CompHealth and Weatherby Locums.

122.    None of these companies have worked with Dr. PLANCHARD since receiving Defendants' false and defamatory letters.

123.    Further, Plaintiff was left with no hospital privileges anywhere, inhibiting his ability to earn a living.

124.    After being summarily dismissed and without hospital privileges, Plaintiff was forced to "scramble" to find short term, temporary work while he searched for permanent employment.

125.    Plaintiff is informed and believes Defendants have engaged in other defamatory and slanderous communications, in effect "black-balling" Dr. PLANCHARD in the local and regional areas.

126.    Despite the Mobile and surrounding areas having a shortage of anesthesiologists, Plaintiff was unable to secure another position locally despite months of earnest searching.

127.    Plaintiff is informed and believes Defendants continued to disparage

Plaintiff's character and refused to provide references or other customary

information in order to sabotage his ability to find employment, verbally

slandering Plaintiff to hospitals in Fairhope, Al, Biloxi, MS and Pensacola,

FL, among others.

128.    At all times related hereto, Defendants continued to discriminate and

retaliate against Plaintiff Dr. PLANCHARD by providing false information

to prospective employers or refusing to offer information needed for purpose

of credentialling because he is Jewish and because he complained about

discrimination by Defendants.

129.    In fact, Plaintiff had to apply to hospitals more than 150 miles away

in order to secure a full time employment contract for January of 2022.

130.    Defendants fabricated a pretextual basis for terminating Plaintiff after

the fact.

131.    On April 16, 2021, Defendants sent Plaintiff Dr. PLANCHARD a

written letter of termination for cause effective that same date, i.e. April 16,

2021.

132.    The pretextual and fabricated bases for termination contrived by

Defendants were:  (a) A complaint from a pediatric patient's parent about

the treatment of her autistic child.  Dr. PLANCHARD's name did not appear

in the complaint which only listed two anesthesiologists, one "good" and one "bad." Dr. PLANCHARD saw the complaint but did not remember the patient. In a text exchange describing the complaint, Mr. Price called it "no big deal." (b) Supposed complaints from a nurse in the GI department which were never brought to Dr. PLANCHARD's attention and have yet to be produced. (c) Supposed deficiencies in charting. However, on March 29, 2021, Plaintiff had gone over all of his charts with the medical director, Dr. Kai Rodning, who replied, via text that with regard to the matter, everything was "copacetic." (d) A deliberate misrepresentation of an interaction with the aforementioned Jehovah's Witness patient. Despite signing a form in the pre-op area refusing blood, she mentioned to Plaintiff, prior to being anesthetized, that she did not understand the term "anemia." When Dr. PLANCHARD explained the word meant a dangerously low blood count, the patient changed her mind and said she would accept blood. It then became Dr. PLANCHARD's legal responsibility to cause the consent to be updated and the patient's wishes addressed. Dr. Hutchens inserted himself into the situation and took over the case. He stated that since little blood loss was expected, changing the blood consent was unnecessary. Plaintiff deferred to Dr. Hutchens, his direct supervisor. Ultimately, no blood was necessary nor given. However, in its termination letter, USA

accused Dr. PLANCHARD of going against a patient's wishes for receiving blood, the exact opposite of the truth.

133.    Pursuant to Defendants' own policy and pursuant to the contract between the parties, Plaintiff Dr. PLANCHARD should have been offered a remediation period before being terminated for cause.

134.    Defendants never offered Plaintiff the required remediation period nor were any of the pretextual bases for termination discussed with Dr. PLANCHARD prior to the series of policy, procedure and contract defying terminations to which Defendants subjected Plaintiff.

135.    Plaintiff Dr. PLANCHARD is informed and believes Defendants have replaced Plaintiff with an anesthesiologist who is not Jewish, i.e. who is outside of Plaintiff's protected class.

136.    As a direct and proximate result of the actions of Defendants and their agents, Plaintiff has suffered financial loss as well as damage related to mental and emotional stress.

137.    Plaintiff continued to face the stress and strain of constantly searching and applying for short, temporary work opportunities, most of which required him to leave his young family for weeks at a time, from April, 2021 through November, 2021.

138.     Plaintiff has been regularly consulting with a therapist to help him

work through the severe mental and emotional distress Dr. PLANCHARD

experienced as a result of Defendants' treatment of him.

139.     On or about September 20, 2021, Plaintiff Dr. PLANCHARD filed a

Charge of Discrimination with the Equal Employment Opportunity

Commission in Mobile, AL.

140.     Plaintiff received a Dismissal and Notice of Rights from the Equal

Employment Opportunity Commission less than 90 days prior to the filing

of this complaint.


## FEDERAL CAUSES OF ACTION

### COUNT 1
### RACE DISCRIMINATION

141.     As the facts alleged in this Complaint show, Defendants

discriminated against Plaintiff because of his race in violation of 42 U.S.C. §

1981 and 42 U.S.C. §§ 2000e, *et seq.*

142.     The Plaintiff Dr. PLANCHARD is a racial minority in that he is was

born to an ethnically 100% Jewish mother and based upon his Jewish

upbringing, outwardly manifests his racial affiliation by donning, among

other things, a Star of David necklace such that Defendants knew that

Plaintiff was a member of a protected class.

143.    At all times related hereto, Plaintiff was a Board-certified anesthesiologist who had trained at the prestigious Cleveland Clinic and as such he was qualified for the employment Defendants recruited him for in December of 2020, especially since according to Dr. Hutchens, Defendants merely sought an anesthesiologist that wasn't "an unmitigated disaster."

144.    Upon discovering he was Jewish, Defendants intentionally discriminated against Plaintiff by, among other things, withholding the employment contract Plaintiff was told to expect prior to the 2020 holidays following his interview, requiring Plaintiff to meet more stringent criteria than other similarly situated anesthesiologists faced before offering him a permanent contract, including, but not limited to requiring unanimous consent and working temporarily as a Locums Tenens employee, requiring him to cancel pre-existing Locums Tenens commitments without sufficient notice in order to receive his permanent contract and by failing to adhere to Defendants' own policies, procedures and contract obligations when terminating Plaintiff.

145.    Defendants further subjected Plaintiff to a hostile work environment by publicly mocking and humiliating Plaintiff Dr. PLANCHARD and by creating, tolerating and even ratifying anti-Semitic behavior by Plaintiff's direct supervisors and co-workers such that the workplace became

permeated with discriminatory intimidation, ridicule and insult that was

sufficiently severe or pervasive such as to alter the conditions of the

Plaintiff's employment and create an abusive working environment.

146.      Plaintiff Dr. PLANCHARD suffered an adverse employment action

when he was fired without cause on March 30, 2021, which was confirmed

on or about April 1, 2021, and for cause on April 16, 2021, none of which

conformed to Defendants written policies and procedures nor the contract

between the parties.

147.      At the time Plaintiff suffered this adverse employment action, it was

based upon racial discrimination, which was at a minimum, a motivating

factor and/or a but for cause for the adverse employment action.

148.      Plaintiff was subsequently replaced  by a person outside of his

protected class.

149.      Additionally, Plaintiff was treated less favorably than similarly

situated non-Jewish anesthesiologists who were not made to work as

Locums Tenens employees prior to being presented with their permanent

contracts, who were not mocked for being Jewish, who were not forced to

cancel prior commitments upon insufficient notice in order to receive a

formal contract and who were not told to cancel their insurance 4 days prior

to being terminated because they would be receiving benefits imminently.

150.     Any bases claimed by Defendants' for terminating Dr. PLANCHARD are clearly pretextual in that Defendants failed to follow their own formal policies, the articulated reasons for Plaintiff's termination were first presented to Plaintiff in a letter sent to Plaintiff 17 days after he was told he was being terminated "without cause" and said reasons were false and hid discrimination.

## COUNT II
## RELIGIOUS DISCRIMINATION

151.     As the facts in this Complaint show, Defendants discriminated against Plaintiff because of his religion in violation of 42 U.S.C. § 2000e, *et seq.*

152.     The Plaintiff Dr. PLANCHARD is Jewish, which religious faith is protected pursuant to 42 U.S.C. § 2000e, *et seq.*

153.     As part of his religious affiliation, Plaintiff Dr. PLANCHARD outwardly manifests his faith by, among other things, wearing a Star of David necklace at all formal occasions including his interview with Defendants in December of 2020, such that Defendants knew that Plaintiff was a member of a protected class.

154.     At all times related hereto, Plaintiff was a Board-certified anesthesiologist who had trained at the prestigious Cleveland Clinic and as such he was qualified for the employment for which Defendants recruited

him in December of 2020, especially since according to Dr. Hutchens,

Defendants merely sought an anesthesiologist that wasn't "an unmitigated

disaster."

155.    Upon discovering he was Jewish, Defendants intentionally

discriminated against Plaintiff by, among other things, withholding the

employment contract Plaintiff was told to expect prior to the 2020 holidays

following his interview, requiring Plaintiff to meet more stringent criteria

than other similarly situated non-Jewish anesthesiologists faced before

offering him a permanent contract, including, but not limited to requiring

unanimous consent and working temporarily as a Locums Tenens employee,

requiring him to cancel a pre-existing Locums Tenens commitment without

sufficient notice in order to receive his permanent contract and by failing to

adhere to Defendants' own policies, procedures and contract obligations

when terminating Plaintiff.

156.    Defendants further subjected Plaintiff to a hostile work environment

by publicly mocking and humiliating Plaintiff Dr. PLANCHARD and by

creating, tolerating and even ratifying anti-Semitic behavior by Plaintiff's

direct supervisors and co-workers such that the workplace became

permeated with discriminatory intimidation, ridicule and insult that was

sufficiently severe or pervasive such as to alter the conditions of the Plaintiff's employment and create an abusive working environment.

157.     Plaintiff Dr. PLANCHARD suffered an adverse employment action when he was fired without cause on March 30, 2021, which was confirmed on or about April 1, 2021, and for cause by letter dated April 16, 2021, no instance of which conformed to Defendants written policies and procedures nor the contract between the parties.

158.     At the time Plaintiff suffered this adverse employment action, it was based upon religious discrimination, which was at a minimum, a motivating factor and/or a but for cause for the adverse employment action.

159.     Plaintiff was subsequently replaced  by a person outside of his protected class.

160.     Additionally, Plaintiff was treated less favorably than similarly situated non-Jewish anesthesiologists who were not made to work as Locums Tenens employees prior to being presented with their permanent contracts, who were not mocked for being Jewish, who were not forced to cancel prior commitments upon insufficient notice in order to receive a formal contract and who were not told to cancel their alternative insurance 4 days prior to being terminated because they were promised that they would be receiving benefits imminently.

161.     Defendants' claimed bases for terminating Dr. PLANCHARD are clearly pretextual in that Defendants failed to follow their own formal policies, the articulated reasons for Plaintiff's termination were first presented to Plaintiff in a letter sent to Plaintiff 17 days after he was told he was being terminated "without cause" and said reasons were false and hid discrimination.

## COUNT III
## RETALIATION

162.     As the facts alleged in this Complaint show, Defendants retaliated against Plaintiff because he verbally reported the pervasive discrimination he faced while employed with Defendants to Mr. Price on April 1, 2021, and because he demanded that Defendants' policies and procedures, as well as his contractual rights, be followed in a non-discriminatory fashion.

163.     Immediately following Plaintiff's complaint to Mr. Price and his request that he be treated under Defendants' policies, procedures and his contract like his non-Jewish peers, Defendants engaged in a campaign of defaming and slandering Plaintiff such that he was unable to secure employment locally or even regionally.

164.     Defendants "black-balled" Plaintiff in the local and regional medical community such that he was unable to secure local employment following his wrongful termination by Defendants.

165.    The timing of the events is circumstantial evidence that Defendants

sought to interfere with Plaintiff's employability in the community and

surrounding communities to retaliate against him or punish him for having

opposed their racist and religiously intolerant treatment of him.

166.    Plaintiff's complaint of racial and religious discrimination and

opposition to discriminatory treatment constituted conduct protected under

federal anti-discrimination statues, which conduct caused, was a motivating

factor in and/or a but for cause of Defendants' interference with Plaintiff's

ability to contract for employment following Defendants' termination of

him.

167.    Any reasons Defendants provide for the "black-balling" of Plaintiff is

a pretext or cover story and the real reason is retaliation and discrimination.

## REQUESTS FOR RELIEF (FEDERAL)

For the reasons described in this Complaint, Plaintiff demands judgment

against Defendants and other specific relief including:

a.   Declaratory judgment that the Defendants violated 42 U.S.C. § 1981 and 42

U.S.C. §§ 2000e, *et seq.*

b.  Compensatory damages, including back pay and front pay.

c.  Punitive and exemplary damages.

d.  Attorneys' fees and costs of suit.

e.  All other relief to which Plaintiff is entitled.

## STATE CAUSES OF ACTION

### COUNT IV
### BREACH OF CONTRACT

168.     As the facts alleged in this Complaint show, Defendants breached

their contract with Plaintiff Dr. PLANCHARD.

169.     The parties entered into a contract titled, "Physician Employment

Agreement" with an effective date of February 28, 2021.

170.     Pursuant to the contract terms, Plaintiff Dr. PLANCHARD could only

be terminated in writing, in consultation with Dr. Chang and upon very

specific notice and remediation terms.

171.     At all times relevant hereto, Plaintiff performed all duties which he

was contractually bound to perform.

172.     Defendants breached the contract with Plaintiff Dr. PLANCHARD in

several ways including, but not limited to: not adhering to the contractual

termination requirements specified in the parties' contract, failing to consult

with Dr. Chang prior to terminating Plaintiff, and failing to act fairly and in

good faith in the parties' contractual dealings.

173.     As a direct and proximate result of Defendants' breach of the parties'

contract, Plaintiff has suffered foreseeable incidental and consequential

damages.

174.     Defendants knew or should have known about the type and extent of

damages Plaintiff suffered as a result of their breach of the contract.

## COUNT V
## TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE

175.     As the facts alleged in this Complaint show, Defendants intentionally

caused numerous third parties not to enter into prospective contractual

relationships for employment with Plaintiff.

176.     Defendants were aware of Plaintiff's existing relationships with

Locums Tenens and other third-party medical employment contracting

agencies who contacted Defendants following Plaintiff's termination to

update their records for Plaintiff.

177.     Defendants were likewise aware of medical establishments in the

local Alabama area, Florida and Mississippi with whom Plaintiff sought

employment following his wrongful termination by Defendants.

178.     Defendants had knowledge that Plaintiff was attempting to secure

future employment as an Anesthesiologist with both the employment

contracting agencies and local medical establishments since many of these

entities contacted Defendants for information as part of their normal and customary hiring process.

179.    At all times relevant hereto, Defendants intentionally sought to "black-ball" Plaintiff by providing false, disparaging, and defamatory information to these third parties designed to disrupt the prospective employment relationships sought by Plaintiff Dr. PLANCHARD with said third parties.

180.    At all times relevant hereto, Defendants intentionally sought to further "black-ball" Plaintiff in the local and regional medical communities by refusing to provide requested information, withholding documents Plaintiff needed for credentialing as well as references customarily provided in the industry to prospective employers and/or provided negative references in order to cause harm to Plaintiff's employability .

181.    As a result of their acts, Defendants directly and proximately caused economic harm and emotional distress and suffering to Plaintiff.

182.    At all times pertinent hereto, Defendants participated in, authorized and/or ratified the acts of its employees and agents, which acts were done for and/or in the line and scope of employment and/or for the Defendants' benefit.

## COUNT VI
## FRAUD

183.    As the facts alleged in this Complaint show, Defendants fraudulently

induced Plaintiff to justifiably rely on promises and representations made by

Defendants who made said promises and representations knowing they were

false.

184.    On or about March 29, 2021, Defendants through their agent Mr.

Price informed Plaintiff he could cancel his marketplace insurance because

he would have U.S.A. Hospital benefits beginning April 1, 2021, knowing

this representation was false as demonstrated by Mr. Price verbally

terminating Plaintiff the following day on March 30, 2021.

185.    Plaintiff justifiably relied on Mr. Price's representations about

insurance which directly and proximately caused Plaintiff to suffer economic

damages and  emotional and mental stress necessitating mental health

intervention.

186.    On or about February 28, 2021, Defendants through their agents Dr.

Hutchens and Mr. Price fraudulently represented, knowing this

representation to be false, to Plaintiff he would be provided long term

employment with Defendants so long as Plaintiff canceled his pre-existing

obligation with Locums Tenens dot com despite Defendants' knowledge

Plaintiff was outside of the 30 cancellation "window."

187.    Plaintiff justifiably relied on Dr. Hutchens' and Mr. Price's

representations which directly and proximately caused Plaintiff to suffer

economic damages and emotional and mental stress with resulting physical

damages.

## COUNT VII
## NEGLIGENT/WANTON HIRING/TRAINING/SUPERVISION

188.    As the facts alleged in this Complaint show, Defendants negligently

and/or wantonly hired/trained and/or supervised Dr. Hutchens and/or Mr.

Price, as well as other hospital personnel, who were unfit to supervise other

medical professionals.

189.    Dr. Hutchens and/or Mr. Price engaged in ongoing conduct

constituting torts against Plaintiff as recognized under Alabama law

including, but not limited to defamation, libel, slander as set forth in Count

VII and fraud as set forth in Count VI.

190.    Dr. Hutchens and Mr. Price engaged in tortious conduct that was so

egregious and pervasive against Plaintiff and upon information and belief,

other minorities, that Defendant had actual and/or constructive notice or

should have known of their employee's tortious conduct and failed to

adequately respond to the notice and take adequate stops to remedy the situation.

191.    Defendants and U.S.A. in general are presently the subjects in an investigation related to alleged inappropriate racial and ethnic disparaging demonstrations as well as demeaning, racial, and sexual harassment from numerous administrative members including University Presidents, Department Chairs and most recently allegations against a Women's Coach for sexual harassment of players indicating a widespread and system wide lack of proper training, hiring and supervision at U.S.A. and other Defendant operated businesses and institutions.

## COUNT VIII
## DEFAMATION/LIBEL/SLANDER

192.    As the facts alleged in this Complaint show, Defendants have intentionally and or recklessly published false statements to third party prospective employers including online employment companies including, but not limited to Locums Tenens, Weatherby Healthcare and Global Medical Staffing as well as numerous local and regional hospitals.

193.    Said published statements were not opinions but purported to be facts about Plaintiff pertaining to his employment which caused a "black-balling"

of Plaintiff, preventing him from obtaining employment with these institutions, resulting in economic, mental and emotional harm.

194.     Said false representations purporting to be facts included, but are not limited to claiming Plaintiff Dr. PLANCHARD was terminated while in the employ of Locums Tenens rather than on April 16, 2021, the date of termination in the only written notice provided to Plaintiff, providing bad "word of mouth" about Plaintiff to prospective employers, claiming complaints had been made about Plaintiff in complete contradiction of Mr. Price's statements to Plaintiff, claiming Plaintiff was "bipolar" and otherwise disparaging Plaintiff's fitness as a medical doctor and anesthesiologist.

195.     During his employment with Defendants, Defendants agents also intentionally and/or recklessly made false and defamatory statements purporting to be facts claiming Plaintiff was a "KIKE", "only in it for the money", loud and obnoxious and other derogatory characteristics of the negative, stereotypical Jewish person.

196.     Plaintiff is informed and believes said false and defamatory statements took place from the time he interviewed with Defendants on or about December 9, 2020, through the present.

197.    As a direct and proximate result of Defendants false, defamatory remarks, Plaintiff Dr. PLANCHARD has been denied employment opportunities and has suffered ongoing economic, emotional and mental damages.

## COUNT IX
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS/OUTRAGE

198.    As the facts alleged in this Complaint show, Defendants have engaged in conduct so outrageous in character, and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized society which conduct intentionally and/or recklessly caused Plaintiff emotional distress so severe that no reasonable person could be expected to endure it.

199.    The Jewish people have long endured oppressive hatred and repeated attempts at genocide through the ages such that discrimination against them carries the weight of historical oppression.

200.    At all times pertinent hereto extending over the course of many months since December of 2020, Defendants have engaged in a pattern of activity involving a great many persons including co-workers, supervisors and the varied individuals who have attempted to "black-ball" Plaintiff in the local and regional community.

201.    As a direct result of the long history of vile discrimination, hatred and genocide attempts directed toward the Jewish people in conjunction with the pervasive pattern of discrimination and oppression directed toward Plaintiff, Defendants should have known Dr. PLANCHARD was likely to suffer extremely serious repercussions and emotional/mental distress as a result of their outrageous conduct.

202.    At all times relevant hereto, the outrageous actions directed toward the Plaintiff were directed toward an illegal purpose, discrimination based on race and religion, which is prohibited by Title VII and § 1981 of the Civil Rights Act.

203.    Defendants' extreme and outrageous discriminatory conduct has continued beyond Plaintiff's employment with Defendants such that Dr. PLANCHARD has not been able to find relief from it and which has forced him to seek employment away from Mobile, his home.

204.    In addition to economic damages, Plaintiff has incurred substantial medical costs as a result of Defendants' outrageous conduct.

205.    The toll of the stress and strain to Plaintiff proximately caused by Defendants' extreme and outrageous conduct has forced Plaintiff into therapy and has required Plaintiff to seek ongoing mental health intervention.

## REQUESTS FOR RELIEF (STATE)

For the reasons described in this Complaint, Plaintiff demands judgment against Defendants and other specific relief including:

a.  Compensatory damages, including compensation for economic loss and mental and emotional distress.

b.  Punitive and exemplary damages.

c.  Attorneys' fees and costs of suit.

d.  All other relief to which Plaintiff is entitled.

**PLAINTIFF DEMANDS A TRIAL BY STRUCK JURY.**

Respectfully submitted this _22_ day of December, 2021.

JEFFREY A. PLANCHARD

**STATE OF ALABAMA**
**COUNTY OF MOBILE**

I, the undersigned Notary Public, in and for said State and County, hereby certifies that JEFFREY A. PLANCHARD, whose name is signed to the foregoing Complaint, and who is known to me, acknowledged before me on this date that,

being informed of the contents of said pleading, executed the same voluntarily on the day the same bears date.

Given under my hand and seal this ___ day of December, 2021.

NOTARY PUBLIC
My Commission Expires: 1/4/2623

/s/ Christine Hernandez
Christine Hernandez (HER051)
/s/ Deborah A. Mann
Deborah A. Mann (MAN072)
The Hernandez & Associates Firm, LLC
Attorneys for Plaintiff
PO BOX 66174
MOBILE, AL 36660-1174
(251)479-1477 OFFICE
(251)650-3843 FAX
Christine@equalizingjustice.com
Deborah@equalizingjustice.com

Of Counsel:
The Hernandez & Associates Firm, LLC
Attorney for Plaintiff
PO BOX 66174
MOBILE, AL 36660-1174
251)479-1477 OFFICE
 (251)650-3843 FAX
Christine@equalizingjustice.com