## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| JEFFEREY A. PLANCHARD, MD, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO. 1:21-cv-551-TFM-B |
| | ) | |
| USA HEALTHCARE MANAGEMENT, | ) | |
| LLC, *et al.* | ) | |
| | ) | |
| **Defendants.** | ) | |

### MEMORANDUM OPINION AND ORDER

Pending before the Court is *Defendants' Motion for Summary Judgment* (Doc. 109, filed September 16, 2024) and the related *Motion to File Under Seal Certain Evidence in Support of Defendant's Motion for Summary Judgment* (Doc. 103, filed September 15, 2024). Having considered the motions, the response (Doc. 114) and reply (Doc. 115) to the motion for summary judgment, and relevant law, the Court finds the motion for summary judgment is due to be **GRANTED in part and DENIED in part** and the motion to file under seal is due to be **DENIED**.

## I.    JURISDICTION AND VENUE

Plaintiff Jefferey A. Planchard, MD ("Plaintiff" or "Dr. Planchard"), brings suit against Defendants USA Healthcare Management, LLC ("USAHCM"), Dennis Wade Hutchens, MD ("Dr. Hutchens"), and Andrew Price ("Price") (collectively, "Defendants") for violation of Title VII, among other claims.

The Court has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1331 (federal question).

The parties do not contest personal jurisdiction or venue, and there are adequate allegations to support both. The district court has personal jurisdiction over the claims in this action because

the events that gave rise to this action are alleged to have occurred within this district.  *See Consol.*

*Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291-92 (11th Cir. 2000) ("Specific jurisdiction arises

out of a party's activities in the forum that are related to the cause of action alleged in the

complaint. . . . General personal jurisdiction, on the other hand, arises from a defendant's contacts

with the forum that are unrelated to the cause of action being litigated.  The due process

requirements for general personal jurisdiction are more stringent than for specific personal

jurisdiction, and require a showing of continuous and systematic general business contacts between

the defendant and the forum state.").

Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part

of the events or omissions that gave rise to this litigation occurred in this judicial district.

## II.    BACKGROUND

### A.    Factual Background[1]

---

[1] At the summary judgment stage, the facts are "what a reasonable jury could find from the evidence viewed in the light most favorable to the non-moving party." *Cantu v. City of Dothan*, 974 F.3d 1217, 1222 (11th Cir. 2020) (quoting *Scott v. United States*, 825 F.3d 1275, 1278 (11th Cir. 2016)).  "[W]here there are varying accounts of what happened, the proper standard requires us to adopt the account most favorable to the non-movant."  *Id.* (quoting *Smith v. LePage*, 834 F.3d 1285, 1296 (11th Cir. 2016)).  Therefore, the recitation of facts here are those construed in favor of the Plaintiffs.  "The 'facts' at the summary judgment stage are not necessarily the true, historical facts; they may not be what a jury at trial would, or will, determine to be the facts."  *Id.*

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or (4) issue any other appropriate order.

FED. R. CIV. P. 56(e)(1)-(4); *see also* S.D. ALA. CIVLR 56(b) ("The non-movant's brief must include: (1) all facts relied upon, each supported by a specific, pinpoint citation to the record: (2) all challenges to the movant's asserted facts; and (3) argument supported by legal authority as appropriate."); S.D. ALA. CIVLR 56(d) ("The Court will deem uncontroverted material facts to be admitted solely for the purpose of deciding the motion for summary judgment.").  Further,

Dr. Planchard is a board-certified anesthesiologist. Doc. 106-1 at 24, 213-16. In December 2020, Dr. Planchard was employed at Springhill Hospital in Mobile, Alabama, through an agency, Epix Anesthesia, that contracted with the hospital, but while he worked there, he accepted temporary employment assignments, i.e., locum tenens, through placement agencies. Doc. 106-1 at 54-55; Doc. 106-2 at 10-11. On December 2, 2020, Taylor Young ("Young"), a representative of one such placement agency, LocumTenens.com, emailed Dr. Planchard's curriculum vitae ("CV") to Price, who was the Director of Anesthesia at USA Health.[2] Doc. 106-5 at 3, 21-22; Doc. 106-24 at 2-4. On December 3, 2020, Price emailed Dr. Planchard and asked to interview him for a permanent position at USA Health, which had a shortage of anesthesiologists on staff, and mentioned USA Health was contemplating starting an anesthesia residency program. Doc. 106-1 at 57-59; Doc. 113-1 at 65. The interview was scheduled for December 9, 2020. Doc. 106-1 at 61; Doc. 106-5 at 21.

Before the interview, Dr. Planchard separately spoke by telephone with Dr. Hutchens, the Chief of Anesthesiology, and Price. Doc. 106-5 at 16-18. During Price's telephone conversation with Dr. Planchard, he again communicated USA Health was contemplating establishing an anesthesia residency program. *Id.* at 20-21. On the day of, and prior to, Dr. Planchard's interview,

---

Plaintiff, in his motion to strike, functionally objects to all the facts that Defendants present. Regardless, the Court does its best to cull through the evidence and considers the undisputed and disputed facts in the light most favorable to the Plaintiff.

[2]      "USA Health" is not a legal entity. It is a trade and marketing name used by [the University of South Alabama ("USA")] to distinguish its healthcare services from other University departments. USA Health refers collectively to the University's healthcare system, which consists of five components – Children's & Women's Hospital, University Hospital, Mitchell Cancer Institute, USA Health Physicians Group, and the College of Medicine. All of the USA Health components are controlled by the University of South Alabama Board of Trustees.

Doc. 22-1 at 3.

he telephoned Dr. Carole Boudreaux ("Boudreaux"), the Director of Graduate Medical Education, to question her about the potential residency program.  Doc 106-1 at 62-65; Doc. 113-1 at 171.

At the interview, Dr. Planchard met with Price; Dr. Hutchens; Dr. Michael Chang ("Dr. Chang"), USA Health's Chief Medical Officer; and Dr. Kai Rodning ("Dr. Rodning"), University Hospital's Medical Director for Anesthesiology.  Doc. 106-1 at 66-67; Doc. 106-3 at 7; Doc. 106-5 at 11-14.  The interview was conducted in a boardroom at University Hospital.  Doc. 106-1 at 67; Doc. 106-19 at 4.  Dr. Planchard identifies as Jewish for his race, ethnicity, and religion and wore a visible Star of David necklace over his tie during his interview.  Doc. 106-1 at 2-5, 69-70, 221; Doc. 113-1 at 102-03.  Dr. Planchard claims Dr. Hutchens "turned ghostly pale" when he saw Dr. Planchard's necklace.  Doc. 113-1 at 164.  None of the interviewers claim to have seen Dr. Planchard's Star of David necklace during the interview.  Doc. 106-4 at 1-2; Doc. 106-5 at 24; Doc. 106-11 at 11; Doc. 106-19 at 9.  Dr. Planchard recalls Price told him he would receive an employment contract by the holidays.  Doc. 106-1 at 57.

On December 30, 2020, Dr. Planchard's employment at Springhill Hospital was terminated.  Doc. 106-2 at 10-11.  Dr. Planchard attributes the termination of his contract to a disagreement between he and a pulmonologist, who was directly contracted with the hospital rather than through a contracting agency as Dr. Planchard was.  *Id.*  Dr. Planchard emailed Dr. Hutchens and Price to explain what occurred.  *Id.* at 11.  The circumstances of Dr. Planchard's departure from Springhill Hospital caused concern among Dr. Hutchens, Price, and Dr. Rodning, and Price suggested Dr. Planchard could be offered locum tenens work for two months that could result in full-time employment, depending on his performance during that period.  Doc. 106-3 at 7-8; Doc. 106-5 at 35.

On January 14, 2021, Price emailed Dr. Planchard an offer letter that included an

acknowledgement form for Dr. Planchard to sign and a draft "Physician Employment Agreement." Doc. 106-5 at 29-36, 98-132.  The offer letter states, "Any offer of employment would be subject to the completion of your current locum tenens contract with USA Health to the satisfaction of the Department of Anesthesiology."  *Id.* at 99.  Dr. Planchard signed and dated the acknowledgement form on the same date when he received it.  Doc. 106-1 at 223.  However, Dr. Planchard believed the two-month locum tenens assignment was a means for USA Health to reduce his permanent placement fee that was to be paid by USA Health to LocumTenens.com.  Doc. 113-1 at 111-12, 190-91.

Before Dr. Planchard began his locum tenens with USA Health, he worked an assignment in the Virgin Islands during the month of January 2021.  Doc. 106-1 at 57.  Dr. Planchard's locum tenens assignments with USA Health and in the Virgin Islands were brokered by LocumTenens.com.  *Id.* at 90-91.

Dr. Planchard began his two-month locum tenens assignment at USA Health on February 1, 2021.  *Id.*  Dr. Planchard's first assignment from LocumTenens.com was to meet Dr. Rodning at 7:00 a.m., but he arrived one (1) hour early, before Dr. Rodning was present to tour Dr. Planchard around the facility.  *Id.* at 80, 92, 224.  Instead, Dr. Hutchens toured Dr. Planchard.  *Id.* at 80-81, 92.  According to Dr. Planchard, Dr. Hutchens instructed him not to report to LocumTenens.com that he worked an extra hour because he arrived early for the assignment.  *Id.* at 80-81, 93.  Further, according to Dr. Planchard, Dr. Hutchens explained, "[N]ot all of us are all about the money," a statement which Dr. Planchard understood was directed to his Jewish identity.  *Id.*

While Dr. Planchard worked at USA Health, staff workers complained Dr. Planchard claimed he would lead the potential residency program.  Doc. 106-3 at 19.  Dr. Planchard clarified

he told others he was hired to help create a residency program.  Doc. 106-1 at 100.  Dr. Hutchens met with Dr. Planchard and told him he did not need to talk about the residency program because the decision to create it was not final and discussing it was poor for department morale, especially among the CRNAs whose employment may be affected by such a program.  Doc. 106-3 at 19.

On February 23, 2021, Dr. Rodning emailed Price and communicated issues in regard to Dr. Planchard: an interaction with Dr. Snypes that led Dr. Snypes to state, "[I]f [Dr. Planchard] gets hired I might have to look elsewhere for a job," and statements from staff that Dr. Planchard claimed he was hired to be the chief anesthesiologist and was "in charge of the residency program." Doc. 106-5 at 43-44, 138.  Based on the issues that Dr. Rodning identified and communicated to Price, he spoke with Dr. Planchard.  *Id.* at 43-44.  Before Price spoke with Dr. Planchard, he met with Dr. Chang to clarify what Dr. Chang communicated to Dr. Planchard about a residency program.  *Id.* at 44-45.  Dr. Chang states he did not promise Dr. Planchard a leadership role in the department of anesthesia and Dr. Planchard confirmed he was not promised by Dr. Chang he would be chief anesthesiologist or director of the residency program.  Doc. 106-1 at 104; Doc. 106-11 at 17-18.

In late February 2021, Dr. Planchard states he stood at an assignment board in University Hospital and overheard Dr. Hutchens, whose voice he recognized, tell another person, who he believes was Chuck Musslewhite, a CRNA, respond to a question about whether Dr. Planchard would be hired and when he would start.  Doc. 113-1 at 103-05.  Dr. Planchard states Dr. Hutchens responded, "anything less than an unmitigated disaster and we hire him," and "[t]hat seems like an awfully low bar to cross with the kike[3] they hired as a replacement."  *Id.* at 105.  Dr. Planchard did

---

[3] Merriam-Webster Dictionary defines "kike" as "used as an insulting and contemptuous term for a Jewish person."  Definition of "kike", MERRIAM-WEBSTER, https://www.merriam-webster.com (search "kike").

not confront Dr. Hutchens about the statement and did not immediately lodge a complaint in response.  Doc. 106-1 at 112.

Dr. Hutchens does not recall the conversation that Dr. Planchard describes but states he has never used the slur that he is accused of saying and has never referred to Dr. Planchard "by a name that relates or refers to his Jewish identity."  Doc. 106-4 at 1.  Musselwhite also does not recall the conversation that Dr. Planchard describes.  Doc. 106-18 at 3-4.

Dr. Planchard states his Jewish religion and ethnicity was well known and it was a "topic of discussion regularly."  Doc. 113-1 at 102-03.  Dr. Planchard states he believes he had a conversation with Dr. Hutchens about his Jewish identity on the "very first day."  *Id.* at 103.  Dr. Planchard did not wear his Star of David necklace daily while at work.  *Id.* at 102.

In late February 2021, Dr. Planchard met with Price to discuss the progress of his contract.  Doc. 106-1 at 74-75.  Dr. Planchard states Price conveyed Dr. Hutchens wanted Dr. Planchard to meet "every single person" to which Dr. Planchard asked, "Why does this have to be unanimous?  Like am I breaking the color barrier?"  *Id.* at 73.  Dr. Planchard explained "breaking the color barrier" was a "reference to when Jackie Robinson had to enter Major League Baseball, there was an unstated sort of agreement between the owners that everybody – if there was going to be somebody to break the color barrier, that everybody had to agree who it would be."  *Id.* at 73-74.  Dr. Planchard states Price asked if he felt discriminated against to which Dr. Planchard declined to answer despite feeling such.  *Id.* at 74.  Dr. Planchard states he did not want to raise the subject of discrimination while his contract was pending.  *Id.*

Dr. Planchard states he heard Dr. Hutchens make other insensitive comments.  Dr. Planchard states Dr. Hutchens would intentionally mispronounce Dr. Chang's name (i.e., "Chang, Wang, Chan, Wan"), referred to another USA Hospital anesthesiologist, Dr. Aston Archibald ("Dr.

Archibald"), as "our token black person," referred to Dr. Gelpi as a "crazy Cuban" in a discussion about his pet zonkey, and refer to as stupid Dr. Saroj Shah's ("Dr. Shah") Hindu religious rituals that were attendant to a family death.  Doc. 106-1 at 78-80, 210-11; Doc. 113-1 167-68.  Dr. Hutchens denies he made these remarks that Dr. Planchard details.  Doc. 106-4 at 2.

Dr. Planchard states others at USA Hospital made insensitive comments that invoked Jewish stereotypes.

Dr. Planchard states Dr. Archibald, in a discussion about the difference between the experience of African-Americans and Jews in the United States, told him, "Jews gave each other a leg-up," implied Jews cheated to be successful, and Jews "involved themselves in organized crime, and that's how they got themselves out of the ghetto."  Doc. 106-1 at 969-70.  Dr. Archibald denies he made these statements to Dr. Planchard.  Doc. 106-8 at 11-12, 20-21.

Dr. Planchard states Dr. Rodrigo, in response to Dr. Planchard's prompt of whether he fired someone, said, "Yeah, there was this one doctor, loud, argumentative, Jewish.  You know how they can be. . . . [H]e was very obnoxious.  Nobody like him.  He's very bossy.  He didn't get along with the group.  But they really couldn't find a way to get [r]id of him."  Doc. 106-1 at 116-17.  Dr. Planchard states Dr. Rodrigo then said:

> So one day he was sort of trying to catch up to a nurse to try and really get something right about a patient or patient information, and he grabbed her by the arm, and then she feigned defense.  And then finally they had a reason to get rid of him.  And he kind of tried to play the part like he was defending him, but really he was playing both sides.  And they ended up firing this Jewish guy.

*Id.* at 117-18.  This incident did not occur while Dr. Rodrigo worked at USA Health.  *Id.* at 118.  Dr. Rodrigo does not recall he made these statements to Dr. Planchard.  Doc. 106-20 at 3-4.

Dr. Planchard states CRNA Mike Tomlinson ("Tomlinson"), who Dr. Planchard worked with while at Springhill Hospital, said, when a Covid vaccine was to be released, he would wait

for the AstraZeneca version because the "other ones were designed by Jews," Dr. Planchard was only able to succeed in school or become a doctor because of his "Jew gold," and in response to Dr. Planchard's comment that a "super thin" patient looked like "one of those Auschwitz survivors," Tomlinson responded, "Why?  Because she has a big nose?" to which Dr. Planchard responded, "Dude, that's not funny."  Doc. 106-1 at 121-22.  Dr. Planchard did not report these remarks that he describes but felt there was "nobody to complain to" since his direct supervisor, Dr. Hutchens, used a derogatory slur to refer to him and Price was a "political windsock."  *Id.* at 116, 120, 122-23.

Before Dr. Planchard began his locum tenens assignment with USA Health, he took an out-of-state assignment for the last weeks of March 2021 that conflicted with his USA Health assignment.  Doc. 106-1 at 94-95.  Price states Dr. Planchard told him he needed to sign his employment agreement before he would cancel his out-of-state assignment.  Doc. 106-6 at 1.  Price states he believed Dr. Planchard intended to leverage his out-of-state assignment to secure an employment contract sooner than originally planned but agreed to arrange for him to sign a contract.  *Id.* at 1-2.

On February 28, 2021, Price met with Dr. Planchard to sign his Physician Employment Agreement ("Employment Agreement").  Doc. 106-1 at 101; Doc. 106-5 at 138-39.  At the meeting, Price clarified to Dr. Planchard there would be a national search for a residency program director at an appropriate time and Dr. Planchard's Employment Agreement did not include language about a residency program.  Doc. 106-1 at 101-02; Doc. 106-5 at 44-46, 138-39.  The Employment Agreement had an effective date of February 28, 2021, a commencement date of April 1, 2021, and was signed by Dr. Hutchens on behalf of USAHCM, G. Owen Bailey as the Chief Executive Officer, and Dr. John V. Marymont, Vice President for Medical Affairs and Dean

of the College of Medicine, University of South Alabama.  Doc. 106-1 at 238; Doc. 106-5 at 62-63.

During Dr. Planchard's time at USA Health, he was assigned to work the gastrointestinal ("GI") unit for a majority of that time.  Doc. 113-1 at 122-123.  Dr. Shah, who was at USA Health under a locum tenens assignment, regularly worked on the GI unit but she was absent for an extended period to settle her father's estate following his death.  *Id.* at 121-23.  Dr. Planchard stated work in the GI unit did not present a challenge, the cases were simple, and the assignment to the unit became "old" over time.  Doc. 106-1 at 105.  Dr. Hutchens states his department had a responsibility to staff the GI unit daily, locum tenens physicians were often assigned to the GI unit when they were new to the hospital, and other anesthesiologists arrived prior to Dr. Planchard for shifts to claim other assignments.  Doc. 106-4 at 3.

On March 19, 2021, the parent of a special needs patient who was at the Children's and Women's Hospital complained about an anesthesiologist's behavior when he ignored the parent's directions as to how to administer medication to sedate the patient.  Doc. 106-5 at 46-48, 140. Based on the patient's information and who treated them, Price met with Dr. Planchard on March 23, 2021, to present and discuss the complaint.  Doc. 106-1 at 124-27.  Dr. Planchard was not mentioned by name in the complaint but acknowledged it was more than likely him who was referenced therein.  *Id.* at 125-26.

Another issue arose with Dr. Planchard about his medical case charting.  Doc. 106-3 at 19-20.  Specifically, Dr. Hutchens states he received complaints that Dr. Planchard, on multiple occasions, entered preoperative evaluations in the record after the cases began and entered post-anesthesia notes before an anesthetic was finished.  *Id.*  Dr. Hutchens met with Dr. Planchard to identify the issue and inform Dr. Planchard to correct the conduct.  *Id.*  Dr. Hutchens states Dr.

Planchard's medical case charting issues persisted despite their discussion of the topic. *Id.* at 40. Dr. Rodning received similar complaints about Dr. Planchard's medical case charting and he also tried to counsel Dr. Planchard to correct his conduct. Doc. 106-19 at 13-15.

In mid-March 2021, Price coordinated with the human resources department to schedule Dr. Planchard's onboarding and set up his health insurance to be effective on April 1, 2021, the effective date of his employment contract with USA Health. Doc. 106-5 at 141-44; Doc. 106-6 at 2.

On March 30, 2021, Dr. Planchard was assigned as the anesthesiologist for a patient who was labeled as a Jehovah's Witness in her records. Doc. 106-1 at 131-33. The patient was scheduled for a procedure that was to be performed by Dr. Brian Jones ("Dr. Jones") who described the procedure as a "simple debridement," during which superficial dead tissue is removed from around a wound where a vein was harvested for a prior coronary bypass surgery. Doc. 106-14 at 4-7. Dr. Brian Gelpi was the patient's pre-op anesthesiologist, and he spoke with her about whether she would receive blood products during the operation, which she declined based on her religious beliefs. Doc. 106-13 at 3-4, 7-9. Dr. Jones also performed a pre-op examination of the patient during which he discussed with the patient her blood counts were low but the procedure carried a low risk of bleeding and would be safe without the use of blood products. Doc. 106-14 at 9.

While the patient was being transported to the operating room, Dr. Planchard was with her and he states she asked him about anemia in response to which he explained it describes a patient who has a low blood count. Doc. 113-1 at 133-35. Dr. Planchard states the patient then asked if her anemia meant she needed a blood transfusion to which he responded a transfusion would ordinarily be performed, except she was a Jehovah's Witness. *Id.* at 135. Dr. Planchard states the

patient then stated she was not a Jehovah's Witness but her sister was and she consented to the use of blood products. *Id.* Dr. Planchard states he told the circulating nurse the patient denied she was a Jehovah's Witness and her consent to the use of blood products needed to be updated. *Id.* at 136. Dr. Planchard states the circulating nurse asked him whether he was the person who procured the patient's pre-op consent to not receive blood products to which he responded he was not. *Id.* at 137. Dr. Planchard states the circulating nurse then notified the central circulator of the situation and she also inquired whether he procured the patient's pre-op consent and whether he had administered any medication, both of which he denied, but he insisted the patient's consent should be updated. *Id.* at 137-38. Staff in the operating room took exception to Dr. Planchard's attempts to change the patient's consent and the circulating nurse left the room to request the surgeon, Dr. Jones, address the situation. Doc. 106-10 at 1-2; Doc. 106-14 at 11-12.

Dr. Jones entered the operating room and spoke with Dr. Planchard. Doc. 106-14 at 13-14. Dr. Jones told Dr. Planchard he assessed the procedure did not present a high risk for blood loss and confirmed Dr. Planchard was aware the patient was a Jehovah's Witness. Doc. 106-14 at 12-15. Dr. Jones told Dr. Planchard he would find another anesthesiologist who would be comfortable with performing the procedure. *Id.* at 15. Their conversation continued outside of the operating room, close by, in the anesthesiology office where Dr. Jones tried to poll others about the situation. Doc. 106-14 at 18. Dr. Stephen Snypes ("Dr. Snypes") was present in the office and believed Dr. Hutchens should be contacted to mediate the situation. *Id.* Dr. Jones left the anesthesiology office to separate from Dr. Planchard, who continued to question Dr. Jones, and wait for Dr. Hutchens to arrive. *Id.* at 18-19. When Dr. Hutchens arrived, he spoke with the two doctors to discuss the situation then determined to find another anesthesiologist for the procedure. Doc. 106-3 at 35; Doc. 106-14 at 19-20. Dr. Planchard states Dr. Hutchens took over as the

anesthesiologist for the procedure and completed the case, during which no blood products were used.  Doc. 106-1 at 143; Doc. 106-5 at 83; Doc. 106-14 at 22-23.

After the procedure for the Jehovah's Witness patient was completed, Dr. Hutchens discussed with the staff who were in the operating room about what occurred when Dr. Planchard raised concerns about the patient's consent to blood products.  Doc. 106-3 at 35-36.  Dr. Hutchens relates the staff described Dr. Planchard as "very unprofessional, almost threatening" and he "made a slashing motion across his neck," a narrative which was agreed to by Dr. Jones.  *Id.*  Dr. Planchard states he signaled to the circulating nurse, when she objected to changing the Jehovah's Witness' consent, to "zip it" when he motioned with his hands over his face, which was masked for the procedure.  Doc. 106-1 at 140-41; Doc. 106-10.  Dr. Hutchens determined an incident report would be submitted to quality assurance and asked Dr. Jones to prepare a written statement of what he recalled of the incident.  Doc. 106-3 at 35-36.

Dr. Hutchens then met with Price to discuss the situation that occurred with Dr. Planchard. *Id.* at 36.  Dr. Hutchens opined to Price that Dr. Planchard "isn't going to work" and "can't continue to work at this facility, at this health system."  *Id.*  They further discussed the issue then phoned legal counsel to schedule an appointment to discuss the issue with them.  *Id.*  Dr. Hutchens states "an agreement was reached" that Dr. Planchard would not continue to work at USA Health.  *Id.*

Price texted Dr. Planchard to come by his office after he completed his shift.  *Id.*; Doc. 106-5 at 60; Doc. 113-1 at 140.  At the meeting, Dr. Hutchens states he and Price told Dr. Planchard his full-time employment at USA Health was contingent on him successfully completing his two-month locum tenens employment and they determined he had not done so, detailed the reasons for their decision, then they asked for Dr. Planchard's badge.  Doc. 106-3 at 36-37; Doc. 106-5 at 69-70; Doc. 113-1 at 140-41.  Dr. Hutchens and Price state they related the reasons for the decision

to terminate Dr. Planchard's locum tenens assignment and not execute his full-time employment contract that included "unprofessional treatment of a special needs patient" at USA Children's and Women's Hospital, complaints from the GI lab nurse manager about his interactions with patients and staff, patient medical charting, and his interaction with Dr. Jones about the procedure for the Jehovah's Witness patient and behavior towards the circulating nurse.  Doc. 106-5 at 69-70.  The reasons for Dr. Planchard's termination as well as a description of his meeting with Dr. Hutchens and Price were memorialized in a termination letter that was sent to Dr. Planchard.  *Id.* at 70; Doc. 106-27.  Dr. Hutchens states he then told Dr. Planchard, "Well, we've said what we needed to say.  The meeting is over.  I need you to leave.  If you're not going to leave, we will call security to escort you out."  Doc. 106-3 at 37.  Dr. Hutchens states Dr. Planchard told them "I'm independently wealthy.  I'm going to sue you, I'm going to sue the hospital, and I'm going to sue Mr. Price," then left.  *Id.*

Dr. Planchard states, at the meeting, Price gestured to a yellow piece of paper with illegible notes that he held and referred to what was listed as the reasons for his termination.  Doc. 106-1 at 147.  Dr. Planchard states he then began to cry and Dr. Hutchens began to taunt him.  *Id.* at 148.  Dr. Planchard states he then told Dr. Hutchens and Price he has children, cancelled his health insurance, had been approved for a mortgage, and had an enforceable contract.  *Id.* at 148-49.  Dr. Planchard states Dr. Hutchens then told Price that Dr. Planchard lacked insight, which Price confirms, and informed Dr. Planchard nobody at the hospital had a positive opinion of him and he could not be trusted cover overnight call.  *Id.*; Doc. 106-5 at 80.  Dr. Planchard states he asked Dr. Hutchens and Price whether they contacted Dr. Chang, a necessary step per the employment agreement that Dr. Planchard was provided.  Doc. 106-1 at 150.  Dr. Planchard states Dr. Hutchens responded he attempted to call Dr. Chang but was unable to speak with him and Dr. Planchard was

welcome to contact Dr. Chang himself.  *Id.*  Dr. Chang states, at the time of Dr. Planchard's termination, he was likely out of town due to his father's recent passing and does not recall that he was contacted about the termination.  Doc. 113-1 at 89-91.  Dr. Planchard states he then told Dr. Hutchens and Price that he would sue them.  Doc. 106-1 at 150.  Dr. Planchard states Price asked if he had his badge and he gave it to Price.  *Id.*  Dr. Planchard states Dr. Hutchens then gleefully told him, "Well, I guess you can go now.  I'd hate to have to call security."  *Id.* at 151.  Dr. Planchard states he then voluntarily left.  *Id.*

After the termination meeting, Price states he contacted someone with LocumTenens.com to cancel Dr. Planchard's final day of locum tenens employment through it, which was March 31, 2021.  Doc. 106-5 at 84.  Price states he explained Dr. Planchard had an unacceptable interaction with a patient.  *Id.*  Dr. Planchard's hospital privileges with USA Health were terminated on March 31, 2021.  Doc. 106-15 at 10.

Dr. Planchard states, following the termination of his locum tenens assignment with USA Health, he spoke with Emily Crocker ("Crocker"), who was a member of the risk department with LocumTenens.com, who mentioned to him she heard about the incident with the Jehovah's Witness patient from Young.  Doc. 113-1 at 150.  Crocker confirms she heard about the incident from Young, who heard about it from one of LocumTenens.com's providers.  *Id.* at 95.  Dr. Planchard states he contacted someone in human resources at USA Health to inquire the reason for his termination and she indicated "patient safety issues, specifically giving blood to a Jehovah's Witness."  *Id.* at 155-56.  Dr. Planchard was asked during an interview in Montgomery, Alabama if it was true that he was removed from USA Health in shackles.  Doc. 106-2 at 2.  In a telephone conversation with a confidant, Dr. Planchard states the confidant heard he left USA Health because he was bipolar.  Doc. 113-1 at 151.

A letter was sent via certified mail that was addressed to Dr. Planchard, signed by chief legal counsel for the University of South Alabama, and dated April 16, 2021.  Doc. 113-1at 253. The subject of the letter was "Termination of Physician Employment Agreement," and it states the letter provides notice that the employment agreement with Dr. Planchard that is dated February 28, 2021, was terminated pursuant to Section 5.2 of the agreement, specifically Sections 5.2.1, 5.2.7, and 5.2.9, and termination was effective April 16, 2021.  *Id.*  The relevant portions of Section 5.2 of the employment agreement, which describes reasons for the immediate termination of a physician, read:

> **5.2.    Immediate Termination**.  Subject to the requirements of Section 5.5 of this Agreement, USA Health may immediately terminate the Physician's employment upon giving the Physician written notice of the occurrence of any of the following events:
>
> **5.2.1.**  Upon conduct by the Physician which is unethical, unprofessional, fraudulent, unlawful, or adverse to the interest, reputation or business of USA Health or the Hospital Facilities, including but not limited to conduct which would be deemed by a reasonable person to be disruptive, intimidating, coercive or harassing;
>
> . . .
>
> **5.2.7.**  Upon repeated failure by the Physician to conform and comply with USA Health's professional requirements concerning maintenance of professional records;
>
> . . .
>
> **5.2.9.**  Upon the determination of USA Health in good faith that the health, safety or welfare of patients is jeopardized by continuing the employment of the Physician[.]

Doc. 106-1 at 232.  The letter describes Dr. Planchard's meeting with Dr. Hutchens and Price and the events that violated the employment agreement that were purportedly communicated to Dr. Planchard during the meeting:

- Unprofessional and poor treatment of a special needs patient at USA Children's

and Women's Hospital by you on March 19, 2021, as set forth in a formal patient complaint;

- Numerous complaint s from the Nurse Manager in the GI lab related to your patient and staff interactions;
- Your repeated failure to conform and comply with USA Health's professional requirements regarding preparation and maintenance of medical charts, files, and records; and
- Disrespect of patient's wishes related to refusal of blood products in operating room on March 30, 2021, and subsequent hostile behavior toward circulating nurse and surgeon related thereto which resulted in an RL-6 complaint.

Doc. 113-1 at 253.

As to whether Dr. Planchard reported instances of discrimination to others, Young states, either on the day of Dr. Planchard's termination or the day after, he told her Dr. Hutchens used an antisemitic slur. Doc. 106-24 at 6, 18. Another instance when Dr. Planchard reported a discriminatory event is when, on March 31, 2021, in an email correspondence with Price, Dr. Planchard requested a form to report ethnic slurs that were directed toward him while he was employed at USA Health. Doc. 106-1 at 250. In response, Price stated allegations that ethnic slurs were used against Dr. Planchard were taken seriously and he requested Dr. Planchard to meet with chief legal counsel for the University of South Alabama as well as members of human resources, a request which was denied. *Id.* at 250-51. In a later email exchange between Dr. Planchard and Price on April 2, 2021, Dr. Planchard referenced Dr. Hutchens' purported statement that he was "the new Kike we hired." *Id.* at 252. Price states, prior to the April 2, 2021 email, he was not aware Dr. Planchard was Jewish. Doc. 106-5 at 41. Price also followed up with Dr. Hutchens to inquire whether he made the statement that Dr. Planchard referenced, and Dr. Hutchens denied he did. *Id.* at 75, 90-91.

Dr. Planchard filed his charge of discrimination with the EEOC on September 20, 2021. Doc. 106-1 at 254-62.

**B.    Procedural Background**

The procedural background for this matter was summarized in the Court's October 13, 2023 Memorandum Opinion and Order that addressed Defendants' partial motion to dismiss. Doc. 49. The Court will summarize its ruling in that memorandum opinion and order and what has occurred procedurally in this matter since it was entered.

On October 13, 2023, the Court entered a Memorandum Opinion and Order in which it granted in part and denied in part Defendants' partial motion to dismiss. Doc. 49. The Court granted the partial motion to dismiss as to Plaintiff's state-law claims against USAHCM, which included (Count 6) breach of contract, (Count 7) tortious interference with prospective business advantage, (Count 8) fraud, (Count 9) negligent/wanton hiring/training/supervision, (Count 10) defamation/libel/slander, and (Count 11) intentional inflictions of emotional distress/outrage and dismissed those claims with prejudice because the entity is immune. *Id.* at 35. The Court granted the partial motion to dismiss as to Plaintiff's claims against Defendant USA Health d/b/a University Hospital and dismissed all of the claims against it because it was not a property entity and, even if it were, would be entitled to immunity. *Id.* The Court granted the partial motion to dismiss as to (Counts 4 and 5) those claims that were brought against Dr. Hutchens and Price pursuant to 42 U.S.C. § 1981 as well as Plaintiff's claims against them for negligent//wanton hiring/training/supervision (Count 9) and dismissed those claims with prejudice. *Id.* at 35-36. Finally, the Court granted the partial motion to dismiss as to Plaintiff's request for punitive damages against USAHCM for the federal claims that were brought against it and dismissed with prejudice that claim. *Id.* at 35. Otherwise, the Court ruled the partial motion to dismiss was denied. *Id.* at 36. This left the following claims: (Count 1) race and (Count 2) religious discrimination, and (Count 3) retaliation, in violation of 42 U.S.C. § 2000e-2 against USAHCM, and (Count 6) breach of contract, (Count 7) tortious interference with prospective business advantage, (Count 8)

fraud, (Count 10) defamation/libel/slander, and (Count 11) intentional infliction of emotional distress/outrage against Dr. Hutchens and Price.

Since the Court ruled on the partial motion to dismiss and some of Plaintiff's claims survived, Defendants timely filed their answer to Plaintiff's second amended complaint on October 20, 2023.  Doc. 50.

On February 29, 2024, Plaintiff filed a motion for leave to amend his complaint for which the Court ordered Defendants to show cause why the motion should not be granted.  Docs. 63, 64. Defendants objected to the motion on the grounds that Plaintiff included claims that the Court dismissed and added more than one claim that was referenced in the motion to which the Court ordered Plaintiff to file a reply.  Docs. 66, 67.  Plaintiff filed a reply in which he indicated he inadvertently included the previously dismissed claims and attached a new proposed third amended complaint.  Docs. 70, 70-1.  The Court then granted the motion, and Plaintiff filed his third amended complaint on March 15, 2024, in which he added a claim for discrimination based on ethnic origin in violation of Title VII, 42 U.S.C. §§ 2000e-2 and deleted those claims that were dismissed.  Docs. 71, 72.  The counts and related claims in the third amended complaint are as follows:  (Count 1) race, (Count 2) religious, and (Count 4) ethnic origin discrimination, and (Count 3) retaliation, in violation of 42 U.S.C. § 2000e-2 against USAHCM, and (Count 5) breach of contract, (Count 6) tortious interference with prospective business advantage, (Count 7) fraud, (Count 8) defamation/libel/slander, and (Count 9) intentional infliction of emotional distress/outrage against Dr. Hutchens and Price.  Doc. 72.  Defendants filed their answer to the third amended complaint on March 29, 2024.  Doc. 73.

On September 15, 2024, Defendants filed the instant motion to file under seal evidence in support of their motion for summary judgment and filed under seal the evidence referenced in their

motion, which consists of four exhibits--sealed Exhibits A, B, C, and D. Docs. 103, 105. The Court ordered the parties to confer with each other to determine if there is a lesser means to protect the confidential information in the relevant documents and, if not, provide the Court a supplemental brief that addresses the appropriate legal requirements to seal documents. Doc. 107. The parties filed a joint status report in which they state sealed Exhibits A, C, and D may be unsealed, but requested sealed Exhibit B remain sealed or be withdrawn from the docket because they agreed to refile it with appropriate redactions. Doc. 111.

On September 16, 2024, Defendants filed their instant motion for summary judgment for which the Court entered a briefing schedule, and the parties timely filed their respective response and reply. Docs. 109, 110, 114, 115. The Court finds oral argument unnecessary to resolve the issues that are raised in the motion for summary judgment, and therefore, the motion is ripe for adjudication.

## III.    STANDARD OF REVIEW

A party in a lawsuit may move a court to enter summary judgment before trial. FED. R. CIV. P. 56(a), (b). Summary judgment is appropriate when the moving party establishes there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *see also Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) ("Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'"). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Ritchey v. S. Nuclear Operating Co.*, 423

F. App'x 955 (11th Cir. 2011) (quoting *Anderson*, 477 U.S. at 248).[4]  At the summary judgment juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.  Only disputes about the material facts will preclude the granting of summary judgment.  *Id*.

The movant bears the initial burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A party must support its assertion that there is no genuine issue of material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  FED. R. CIV. P. 56(c)(1).  The admissibility of evidence is subject to the same standards and rules that govern admissibility of evidence at trial.  *Clemons v. Dougherty County*, 684 F.2d 1365, 1369 n.5 (11th Cir. 1982) (citing *Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 556 (5th Cir. 1980)).

Once the movant meets its burden under Fed. R. Civ. P. 56, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  "A genuine issue of material fact exists when 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1232 (11th Cir. 2011) (quoting *Anderson*, 477 U.S. at 248).  The court must view the facts and draw all reasonable

---

[4] In this Circuit, "[u]npublished opinions are not considered binding precedent, but they may be cited as persuasive authority."  11th Cir. R. 36-2 (effective Dec. 1, 2014); *see also Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 n.1 (11th Cir. 2015) (per curiam) ("Cases printed in the Federal Appendix are cited as persuasive authority.").

inferences in favor of the non-moving party. *Id.* (citing *Rosario v. Am. Corrective Counseling Servs., Inc.*, 506 F.3d 1039, 1043 (11th Cir. 2007)); *Greenberg*, 498 F.3d at 1265 ("We view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion."). However, to avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586 (citations omitted). Conclusory assertions, unsupported by specific facts, that are presented in affidavits opposing the motion for summary judgment are likewise insufficient to defeat a proper motion for summary judgment. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). "Speculation does not create a *genuine* issue of fact." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (citation omitted). If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *See Anderson*, 477 U.S. at 249-50 (emphasis in original) (citations omitted). In short, summary judgment is proper after adequate time for discovery and upon motion against a party who fails to make a showing that is sufficient to establish the existence of an element that is essential to that party's case. *Celotex*, 477 U.S. at 322.

Finally, Fed. R. Civ. P. 56(e) also provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order." FED. R. CIV. P. 56(e).

## IV.    MOTION TO FILE UNDER SEAL

In the parties' joint status report, they state sealed Exhibits A, C, and D may be unsealed, but request sealed Exhibit B remain sealed or be withdrawn from the docket because they agreed

to refile it with additional appropriate redactions. Doc. 111. Accordingly, the motion to file under seal is denied. The previously sealed Exhibits A, C, and D (Docs. 105-1, 105-3, 105-4) will be unsealed and sealed Exhibit B (Doc. 105-2) will be withdrawn from the docket since the parties did not address the sealing factors that are identified in *Romero v. Drummond Co.*, 480 F.3d 1234 (11th Cir. 2007), and *Chicago Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304 (11th Cir. 2001), as the Court ordered (*see* Doc. 107).

## V.    MOTION FOR SUMMARY JUDGMENT

Defendants organize their arguments into two categories, federal and state claims, and generally assert Plaintiff lacks substantial evidence to support each of his claims. *See* Doc. 109. In the alternative, Defendants argue Plaintiff's state-law claims are barred by state-agent immunity. *Id.* at 42.

### A.    Federal Claims

Plaintiff's Title VII claims are premised on the following conduct that is described in his third amended complaint: (1) after his interview, Defendants withheld his employment contract that he was told to expect prior to the 2020 holidays, (2) Defendants required him to meet more stringent criteria than other similarly situated anesthesiologists to receive a permanent contract when they required him to receive unanimous consent from the department and work as a locum tenens employee, (3) Defendants required him to cancel pre-existing locum tenens commitments without sufficient notice to receive his permanent contract, and (4) Defendants failed to adhere to the terms of the employment contract when they terminated him. Plaintiff claims the described conduct was the result of him being Jewish.

As to Plaintiff's federal claims, Defendants argue (1) he failed to timely exhaust his administrative remedies for any adverse actions that do not include his March 30, 2021 termination

from USA Health; (2) he lacks direct and circumstantial evidence of discrimination, cannot form a convincing mosaic that infers discrimination, and does not submit sufficient evidence of a mixed motive; (3) he did not experience a hostile work environment; (4) and USAHCM did not retaliate against him.  Doc. 109 at 26-36.  The Court will address each of Defendants' arguments as they are presented in their motion.

### 1.    Administrative Exhaustion

Defendants argue, other than Plaintiff's termination from USAHCM on March 30, 2021, the adverse actions that he claims are untimely.  *Id.* at 27.

In response, Plaintiff argues the adverse actions that Defendants argue are untimely are permitted under the continuing violations doctrine because USAHCM allowed racial discrimination to occur to such a degree that it seemingly condoned the behavior.  Doc. 114 at 8-9.  Further, Plaintiff argues, if the Court finds the subject adverse actions are not considered under the continuing violations doctrine, the events should be considered as evidence of Defendants' intent to discriminate against him.  *Id.*

"In order to litigate a claim for discrimination under Title VII, the ADA, or the ADEA a plaintiff must first exhaust his administrative remedies, beginning with the filing of a charge of discrimination with the EEOC."  *Rizo v. Ala. Dep't of Hum. Res.*, 228 F. App'x 832, 835 (11th Cir. 2007).  In Alabama, a charge of discrimination must be filed with the EEOC within 180 days of the last discriminatory act.  42 U.S.C. § 2000e-5(e)(1); *Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 421 F.3d 1169, 1178 (11th Cir. 2005) (explaining Alabama is a non-deferral state).

Here, Plaintiff filed his charge of discrimination with the EEOC on September 20, 2021.  Doc. 106-1 at 254-62.  One-hundred eighty days from the date when Plaintiff filed the charge of discrimination is March 24, 2021.  However:

> Federal courts historically have applied the continuing-violation doctrine to permit a plaintiff to recover on an otherwise time-barred claim, where at least one of the violations she alleges occurred within the statutory limitations period. *See Hipp v. Liberty Nat'l Life Ins Co.*, 252 F.3d 1208, 1221-22 (11th Cir. 2001). But, in *Nat'l R. R. Passenger Corp. v. Morgan*, the Supreme Court clarified that 42 U.S.C. § 2000e-5(e)(1) precludes recovery under the continuing-violations doctrine for discrete acts of discrimination or retaliation that occurred outside the statutory limitations period. 536 U.S. 101, 105, 110-15, 122 S. Ct. 2061, 2068, 2070-73, 153 L. Ed. 2d 106 (2002). The Supreme Court explained that each discrete discriminatory act starts a new clock for filing an EEOC charge alleging that act; and time-barred acts are not actionable, even if they are related to acts alleged in a timely-filed charge. *Id.* 536 U.S. at 113, 122 S. Ct. at 2072.
>
> Discrete acts include "termination, failure to promote, denial of transfer, or refusal to hire," each of which is easy to identify. *Id.* 536 U.S. at 114, 122 S. Ct. at 2073; *see also Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 970, 972-78 (11th Cir. 2008) (concluding that employer's refusal to promote plaintiffs to vacant supervisory positions, denial of their requests for light work assignments, and alleged retaliation against them for filing EEOC charges constituted discrete acts). In *Morgan*, the Supreme Court distinguished discrimination and retaliation claims based on a series of discrete acts from hostile-work-environment claims; the Court concluded that, where the plaintiff raises a hostile-work environment claim, § 2000e-5(e0(1) permits recovery for acts that occurred outside the statutory limitations period, as long as at least one act contributing to the hostile work environment took place within the limitations period. *Morgan*, 536 U.S. at 115, 122, 122 S. Ct. at 2073, 2077.

*Abram v. Fulton Cnty. Gov't*, 598 F. App'x 672, 674-75 (11th Cir. 2015). Therefore, any discrete acts that are contained in the charge of discrimination that occurred before March 24, 2021, are time-barred.

Here, Plaintiff brings claims of discrimination, retaliation, and a hostile work environment, and alleges discrete acts that occurred prior to the 180-day limitations period. Therefore, for those discrete acts that occurred prior to March 24, 2021, the Court finds Plaintiff did not administratively exhaust those claims for purposes of his discrimination and retaliation claims. However, since at least one discrete act that Plaintiff alleges occurred within the limitations period, his March 30, 2021 termination, those prior discrete acts that occurred outside of the limitations period will be considered for the purposes of his hostile-work-environment claim and as evidence

of intent for his race, religion, and ethnic origin discrimination claims.

## 2.    Evidence of Discrimination

Defendants argue Plaintiff has not submitted either sufficient direct or circumstantial evidence of discrimination.  Doc. 109 at 28-31.

Under Title VII, it is unlawful for an employer: (1) "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" or (2) "to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee" because of such individual's race, color, religion, sex, or national origin.  42 U.S.C. § 2000e-2(a)(1)-(2).  A Title VII plaintiff can prove intentional discrimination through direct or circumstantial evidence.  *See Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010).

### a.    Direct Evidence

"Direct evidence of discrimination is 'evidence which reflects a discriminatory . . . attitude correlating to the discrimination . . . complained of by the employee.'"  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004) (quoting *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1357 (11th Cir. 1999)).  Direct evidence is "evidence that, if believed, proves [the] existence of [a] fact without inference or presumption."  *Id.* (quoting *Burrell v. Bd. of Trs. of Ga. Military Coll.*, 125 F.3d 1390, 1393 (11th Cir. 1997)).  "'[O]nly the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of' some impermissible factor constitute direct evidence of discrimination."  *Id.* (quoting *Rojas v. Florida*, 285 F.3d 1339, 1342 n.2 (11th Cir. 2002)).

Plaintiff identifies the late February 2021 conversation that he states he overheard during which Dr. Hutchens responded to a question from Musselwhite about whether Plaintiff would be hired and Dr. Hutchens responded, "[A]nything less than an unmitigated disaster and we hire him," and "That seems like an awfully low bar to cross with the kike they hired as a replacement."  Doc. 113-1 at 105; Doc. 114 at 9-10.  Plaintiff does not cite to any case law to support his argument other than repeat the general standard for direct evidence that Defendants cite in their motion.  *See* Doc. 114 at 9.  Defendants argue Dr. Hutchens' claimed use of the derogatory slur is not direct evidence of discrimination because it is not related to a challenged employment action and does not establish discriminatory intent without inference or presumption.  Doc. 109 at 28-29.

> [R]emarks that are not tied to a challenged employment decision or are made by non-decisionmakers do not qualify under [the Eleventh Circuit's] definition of direct evidence of discrimination.  *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1228 (11th Cir. 2002); *Cf. Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989) (O'Conner, J., concurring in judgment) (finding that "stray remarks in the workplace" or statements by non-decisionmakers, or statements by decisionmakers unrelated to the decision process" cannot justify shifting the burden to the employer to show that its decisions are legitimate).

*Robertson v. Riverstone Cmtys., LLC*, 849. F. App'x 795, 801 (11th Cir. 2021).

To determine whether conduct is direct evidence of discrimination, the Eleventh Circuit has considered such factors as whether the alleged discriminator was a plaintiff's supervisor, whether the alleged discriminator was a plaintiff's sole supervisor, whether the discriminatory statements are related to the employment decision, the temporal proximity of the statements to the employment decision, and the frequency of discriminatory statements.  *See Scott*, 295 F.3d at 1227-28 (concluding supervisor's comment, "We'll burn his black ass," which was made after the supervisor filled in for the plaintiff while he was on jury duty and more than one year before the plaintiff was terminated, "was simply too far removed and too indirectly connected to the

termination decision to constitute direct evidence of discrimination under the law of this circuit"); *Haynes v. W.C. Caye & Co.*, 52 F.3d 928, 930-31 (11th Cir. 1995) (concluding the company president's statement that women are "not competent enough" to perform a job that the plaintiff desired, and was denied, was direct evidence of discrimination); *E.E.O.C. v. Beverage Canners, Inc.*, 897 F.2d 1067, 1071 n.9 (11th Cir. 1990) (holding "[d]iscriminatory motive may be proved by direct evidence of the hiring authority's racially discriminatory attitudes, regardless of whether it relates to the employment decision at issue" where the "flagrant, revolting, and insulting racially derogatory remarks towards and in the presence" of black employees by the hiring decisionmaker and other managers for the defendant company created a racially hostile environment); *Burns v. Gadsden State Cmty. Coll.*, 908 F.2d 1512, 1518 (11th Cir. 1990) (holding a college president's statement, "[N]o woman should be named" to a position that plaintiff desired, and was denied, was direct evidence of discrimination); *Buckley v. Hosp. Corp. of Am.*, 758 F.2d 1525, 1527-28, 1530 (11th Cir. 1985) (concluding the sole decisionmaker's statements that he was surprised at the longevity of the staff members, wanted "new blood," intended to recruit "younger doctors and nurses," and commented on plaintiff's "advanced age" were direct evidence of discrimination, even though some of the statements were made more than one-year prior to the employment decision, were direct evidence of discrimination).

Here, the conduct of which Plaintiff complains occurred approximately one (1) month before Plaintiff was terminated, the remark was purportedly made by a direct supervisor, the direct supervisor initiated the complained of employment action, and the remark related to Plaintiff's employment. Viewing the evidence in the light most favorable to the plaintiff, as the Court must, the Court finds there is direct evidence from which a reasonable jury could conclude Defendants acted with discriminatory intent due to the temporal proximity between the alleged use of the

derogatory slur and the adverse employment action.  Since the Court has determined there is direct evidence of discrimination that is sufficient to survive summary judgment, it will not address Defendants' pretext arguments or those arguments that are presented under the circumstantial evidence analysis that is contemplated under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 668 (1973), and its progeny.  However, the Court alternatively finds Plaintiff presents sufficient circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker either under a convincing mosaic or mixed-motive theory of liability.

### 3.    Hostile Work Environment

As part of Plaintiff's claims for (Count 1) race, (Count 2) religion, and (Count 4) ethnic origin discrimination claims, he alleges he was subjected to a hostile work environment.

Defendants argues Plaintiff has not produced evidence to prove he was subjected to a hostile work environment.  Defendants argue Plaintiff alleges one occasion when his supervisor, Dr. Hutchens, made a derogatory slur about him, but Dr. Hutchens agreed to Plaintiff's employment agreement subsequent to the purported use of the slur.  Doc. 109 at 33.  Defendants argue Plaintiff alleges three other occasions when Jewish stereotypes were expressed by his co-workers, but the alleged remarks were not directed at him.  *Id.*  Finally, Defendants argue Plaintiff does not allege Plaintiff was threatened, subjected to inappropriate physical contact, or subjected to any action that interfered with his work.  *Id.*

In response, Plaintiff argues he was subjected to repeated and constant negative Jewish stereotypes.  Doc. 114 at 17.  Plaintiff argues he was told Jewish people were cold blooded killers, their success was due to a scheme to help each other, they relied on "Jew gold," they are loud, argumentative, bossy, and obnoxious, and they are "all about the money."  *Id.*  Plaintiff argues

during instances when he was confronted with negative stereotypes, before he could respond, Dr. Hutchens would intervene and send him away. *Id.* Plaintiff argues the hostile conduct that he alleges occurred over a short period of time, two (2) months, during which time he was assigned to cover the GI lab, which a reasonable trier of fact could infer was intended to limit his interaction with Dr. Hutchens and interfered with Plaintiff's work performance. *Id.*

> To prove a hostile work environment claim, an employee must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." [*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 370, 126 L. Ed. 2d 295 (1993)] (citation and internal quotation marks omitted). When the employee's harassment claim is based on her race, she must prove five elements: (1) she belongs to a protected class, (2) she was subjected to unwelcome harassment, (3) the harassment was based on her race, (4) the harassment was sufficiently severe or pervasive to alter the terms of her employment and create a discriminatorily abusive working environment, and (5) the employer is responsible for the environment under a theory of vicarious or direct liability. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

*Smelter v. S. Home Care Servs. Inc.*, 904 F.3d 1276, 1284 (11th Cir. 2018).

As to the first three elements of Plaintiff's prima facie case (none of which Defendants dispute), he belongs to a protected class, he alleges he was subjected to unwelcome harassment, and the harassment was based on his race, religion, and ethnicity because he was subjected to antisemitic slurs and stereotypes.

### a.    Whether the Harassment was Sufficiently Severe or Pervasive to Alter the Terms of her Employment and Create a Discriminatorily Abusive Working Environment

To establish that harassment was sufficiently severe or pervasive to alter the terms or conditions of her employment, an employee must prove that her work environment was both subjectively and objectively hostile. *Mendoza v. Boden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (en banc). In other words, the employee must first establish that she "subjectively perceive[d] the environment to be abusive." *Harris*, 510 U.S. at 21, 114 S. Ct. 367. Then she also must satisfy the objective component by showing that her work environment was one "that a reasonable person would find hostile or abusive." *Id.*

*Smelter*, 904 F.3d at 1285.

It is clear from the record a reasonable jury could conclude Plaintiff perceived the environment at USAHCM to be abusive since he complained to Young and Price about antisemitic remarks.

> Turning to the objective inquiry, we consider four factors when evaluating whether harassment was objectively hostile: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct reasonably interferes with the employee's job performance." *Mendoza*, 195 F.3d at 1246. Although these factors help guide the inquiry, "the objective element is not subject to mathematical precision." *Bryant v. Jones*, 575 F.3d 1281, 1297 (11th Cir. 2009). We must view the evidence "cumulatively and in the totality of the circumstances." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010).

*Smelter*, 904 F.3d at 1285.  The Court will evaluate each factor in turn.

### i.    Frequency of the Conduct

Plaintiff described several instances when antisemitic slurs and stereotypes were uttered during his two-month locum tenens employment with USAHCM such that the Court finds there is sufficient evidence that shows frequent hostile conduct.

### ii.    Severity of the Conduct

The Eleventh Circuit has stated the use of a racial slur is indicative of severity and distinguished its use when it is directed toward someone.  *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1255 (11th Cir. 2014).  In this case, the purported use of the racial slur by Dr. Hutchens was overheard by Plaintiff and not directed at him.  Other instances that Plaintiff describes involved comments that were communicated to Plaintiff, but were not directed at him, during conversations with co-workers.  The only instance when Plaintiff could be said to have complained about a discriminatory statement was his response to Tomlinson's comment about an extremely thin patient.  Whether a plaintiff objects to verbal harassment and whether the harassment

continues thereafter is indicative of a hostile work environment. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002) ("'Repeated incidents of verbal harassment that continue despite the employee's objections [that] are indicative of a hostile work environment' and not simply some 'magic number' of racial or ethnic insults." *See Shanoff v. Illinois Dep't of Human Servs.*, 258 F.3d 696, 704 (7th Cir. 2001)). Plaintiff has not shown Tomlinson continued to harass him after he took exception to Tomlinson's comment. On balance, the Court finds there is not sufficient evidence that shows objectively severe conduct.

### iii.    Whether the Conduct is Physically Threatening or Humiliating, or a Mere Offensive Utterance

Plaintiff has not shown he was physically threatened by any of the conduct or statements about which he complains. However, as to whether the intent of the complained-of conduct was to humiliate Plaintiff, most of the statements were derogatory of Plaintiff's Jewish identity and faith. Therefore, the Court finds there is sufficient evidence that a jury could conclude the complained-of conduct was humiliating.

### iv.    Whether the Conduct Reasonably Interferes With the Employee's Job Performance

As to the effect of the complained-of conduct on Plaintiff's job performance, there is little evidence. While Plaintiff states he was assigned to the GI lab for a majority of his locum tenens assignment with USAHCM, he has not shown his job performance was thereby affected, except he felt bored and unchallenged. Therefore, the Court finds the evidence is neutral as to whether the complained-of conduct interfered with Plaintiff's job performance.

In sum, Plaintiff has met at least two, maybe three, out of the four factors that show his work environment was one that a reasonable person would find hostile or abusive. Therefore, the Court finds the evidence, cumulatively and in the totality of the circumstances, is enough for a

reasonable person to find the offensive conduct was severe or pervasive enough to create an abusive work environment.

### b.  Whether the Employer is Responsible for the Environment Under a Theory of Vicarious or Direct Liability

Under Title VII, an employer's liability for such harassment may depend on the status of the harasser.  If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions.  In cases in which the harasser is a "supervisor," however, different rules apply.  If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable.  But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided.  [*Faragher v. Boca Raton*, 524 U.S. 775,] 807, 118 S. Ct. 2275[, 141 L. Ed. 2d 662 (1998)]; [*Burlington Indus., Inc. v.*] *Ellerth*, [524 U.S. 742,] 765, 118 S. Ct. 2257[, 141 L. Ed. 2d 633 (1998)].

. . .

[A]n employer may be vicariously liable for an employee's unlawful harassment only when the employer has empowered that employee to take tangible employment actions against the victim, *i.e.*, to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibility, or a decision causing a significant change in benefits.  *Ellerth*[, 524 U.S.] at 761, 118 S. Ct. 2257. . . .

[T]he framework set out in *Ellerth* and *Faragher* presupposes a clear distinction between supervisors and co-workers.  Those decisions contemplate a unitary category of supervisors, *i.e.*, those employees with the authority to make tangible employment decisions.  There is no hint in either decision that the Court had in mind two categories of supervisors: first, those who have such authority and, second, those who, although lacking this power, nevertheless have the ability to direct a co-worker's labor to some ill-defined degree.  On the contrary, the *Ellerth/Faragher* framework is one under which supervisory status can usually be readily determined, generally by written documentation.

*Vance v. Ball St. Univ.*, 570 U.S. 421, 424, 431-32 (2013).

Here, Plaintiff alleges harassing behavior by co-workers and a supervisor, so the Court will analyze whether Defendant's response to each of their actions subjects Defendants to liability under the different standards for a co-worker and supervisor.

### i.    Co-Worker

"When . . . the perpetrator of the harassment is not the plaintiff's supervisor, the employer will be held directly liable only if it knew or should have known of the harassing conduct but failed to take prompt remedial action." *Wilcox v. Corr. Corp. of Am.*, 892 F.3d 1283, 1287 (11th Cir. 2018) (citing *Miller*, 277 F.3d at 1278). "An employee can demonstrate that an employer knew about the harassment by showing that she complained to management about it." *Id.* (citing *Henson v. City of Dundee*, 682 F.2d 897, 905 (11th Cir. 1982). "An employee can also show that the company should have known about harassment that was so pervasive as to create an inference of constructive knowledge." *Id.* (citing *Henson*, 682 F.2d at 905).

> To avoid liability for an employee's harassment, an employer must take prompt remedial action upon learning about the harassment. [*Id.*] (citing *Henson*, 682 F.2d at 905). Because that action "must be 'reasonably likely to prevent the misconduct from recurring,'" *Kilgore v. Thompson & Brock Mgmt., Inc.*, 93 F.3d 752, 754 (11th Cir. 1996) (quoting *Guess v. Bethlehem Steel Corp.*, 913 F.2d 463, 465 (7th Cir. 1990)), we look to the effectiveness of the company's action in preventing the recurrence of the harassment it knew about.

*Wilcox*, 892 F.3d at 1288. This analysis can be divided into two elements, (1) notice and (2) remedial action.

Here, Plaintiff has neither shown he formally complained to management about the complained-of conduct by his co-workers nor shown the conduct was so pervasive that it creates an inference of management's constructive knowledge of the conduct. The only notice of harassing conduct toward Plaintiff that he formally reported was to Price after he was terminated, which removed Defendants' ability to take remedial action against the harassment.

Therefore, the Court finds a reasonable jury could not draw inferences which may result in a finding of liability for Plaintiff's co-worker's harassment.

### ii.    Supervisor

Plaintiff has shown he experienced a tangible employment action because of Dr. Hutchens' alleged harassment. *See Vance*, 570 U.S. at 424 ("If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable."); *Ellerth*, 524 U.S. at 761 ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."). Therefore, USAHCM is strictly liable for Dr. Hutchens' alleged harassment.

Having analyzed the factors for a hostile-work-environment claim, the Court has found there is sufficient evidence for a jury to conclude Plaintiff suffered a hostile work environment, and, accordingly, Defendants' motion for summary judgment as to that claim is denied.

### 4.      Retaliation (Count 3)

Defendants argues Plaintiff cannot show he was a victim of retaliation because the protected activity that he claims, when he complained to Price that he had not received his employment agreement, is not protected activity and, in any case, he received his employment agreement after the subject conversation. Doc. 109 at 34-35. Defendants also argue any activity that could be considered protected that Plaintiff engaged in occurred after he was terminated by USAHCM. *Id.* at 35. As to Plaintiff's claims that he received negative and false employment references after he complained of discrimination, Defendants argue he has not provided evidence of such. *Id.*

In response, Plaintiff argues Dr. Hutchens and Price sought to interfere in his search for new employment when they misidentified his termination date, mischaracterized his actions from March 30, 2021, informed potential employers he was terminated from USAHCM because he was bipolar, and spread rumors that he was led out of the hospital in shackles. Doc. 114 at 18.

While Defendants argue the instance when Plaintiff did not receive his employment agreement as a potential discriminatory act, Plaintiff does not make an argument that is related to it and limits his argument to those acts that occurred after he was terminated[5], so the Court will correspondingly limit its analysis.

Section 704(a) of the Civil Rights Act states:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by . . . [Title VII] or because he has made a change, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).

While the retaliatory conduct about which Plaintiff complains occurred after he was terminated, he is still an "employee" for purposes of § 704(a).  *See Robinson v. Shell Oil, Co.*, 519 U.S. 337, 346 (1996) ("[F]ormer employees are within § 704(a)'s coverage.").

> Absent direct evidence of discrimination, when analyzing claims for race-based retaliation brought under § 1981, we employ the tripartite analytical framework developed by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973), and subsequently modified in *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). *See Patterson v. McLean Credit Union,* 491 U.S. 164, 186, 109 S. Ct. 2363, 2377–78, 105 L.Ed.2d 132 (1989) *superseded in part by* Civil Rights Act of 1991, Pub. L. No. 102–166, § 101, 105 Stat. 1071, 1071–72 (codified at 42 U.S.C. § 1981); *Standard v. A.B.E.L. Servs., Inc.,* 161 F.3d 1318, 1330 (11th Cir.1998) (stating that Title VII and § 1981 "have the same requirements of proof and use the same [*McDonnell Douglas*/*Burdine*] analytical framework").    Under this framework, a plaintiff alleging retaliation must first establish a prima facie case by showing that: (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) he established a causal link between the protected activity and the adverse action. *Raney v. Vinson Guard Serv. Inc.,* 120 F.3d 1192, 1196 (11th Cir.1997); *Goldsmith v. City of Atmore,* 996 F.2d 1155, 1163 (11th Cir.1993).  These three elements create a presumption that the adverse action was the product of an intent to retaliate.  Once a plaintiff establishes a prima facie case of retaliation, the burden of production shifts to the defendant to rebut the

---

[5] "Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived." *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009).

presumption by articulating a legitimate, non-discriminatory reason for the adverse employment action. *See Goldsmith,* 996 F.2d at 1163. "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted," *Burdine,* 450 U.S. at 255, 101 S. Ct. at 1094–95, and "drops from the case," *id.* at 255 n.10, 101 S. Ct. at 1095 n.10. After the defendant makes this showing, the plaintiff has a full and fair opportunity to demonstrate that the defendant's proffered reason was merely a pretext to mask discriminatory actions. *See Raney,* 120 F.3d at 1196.

*Bryant*, 575 F.3d at 1307-08.

To prove Plaintiff suffered an adverse employment action, he must show his terms and conditions of employment were adversely affected. *See Veprinsky v. Fluor Daniel, Inc.*, 87 F.3d 881, 891 (7th Cir. 1996) ("[F]ormer employees, in so far as they are complaining of retaliation that impinges on their future employment prospects or otherwise has a nexus to employment, do have the right to sue their former employers under section 704(a)."); *Garcia-Cabrera v. Cohen*, 81 F. Supp. 2d 1272, 1284-85 (M.D. Ala. Feb. 2, 2000) ("In order to be actionable under section 704(a), however, post-termination activity by a former employer must somehow adversely affect the former employee's terms and conditions of employment."); *Ratliff v. Conagra, Inc.*, 2001 U.S. Dist. LEXIS 18394, at *10, 2001 WL 1397298, at *3 (S.D. Ind. Oct. 31, 2001) ("To establish liability, a post-employment retaliation plaintiff must demonstrate an employment impairment that evidences actionable retaliation." (internal quotation marks and citation omitted)).

Beyond statements that Plaintiff heard through the rumor mill that he cannot show are directly attributable to either Dr. Hutchens or Price he fails to show his employment prospects were affected by any alleged post-termination dissemination of information by Dr. Hutchens and Price. Accordingly, Defendant's motion for summary judgment as to retaliation is granted.

**B.      State-Law Claims**

As to Plaintiff's state-law claims, Defendants argue Dr. Hutchens and Price are entitled to state-agent immunity and Plaintiff cannot maintain any such claims, which include claims of

breach of contract, tortious interference, fraud, defamation/libel/slander, and intentional infliction of emotional distress/outrage. The Court will first address Defendants' state-agent immunity argument then its arguments as to each of the state-law claims.

### 1.    State-Agent Immunity

Defendants argue Dr. Hutchens and Price are entitled to state-agent immunity as to Plaintiff's state-law claims because the Court ruled in another memorandum opinion and order USAHCM is entitled to state sovereign immunity and Dr. Hutchens and Price, as employees of USAHCM whose responsibilities included personnel management for the anesthesia department, exercised their judgment in the administration of the department when they terminated Plaintiff. Doc. 109 at 42.

In response, Plaintiff argues Dr. Hutchens and Price's conduct falls within an exception to state-agent immunity. Doc. 114 at 23-24. Plaintiff argues Dr. Hutchens and Price acted beyond their authority when they disregarded the provisions of the employment agreement when they did not provide Plaintiff a thirty (30) day remediation period, did not consult with Dr. Chang before they terminated Plaintiff, and did not provide written notification of the termination until two (2) weeks after his verbal termination on March 30, 2021. *Id.* Plaintiff argues Dr. Hutchens and Price's demeanor during the March 30, 2021 meeting, Dr. Hutchens' use of a derogatory slur, and their acceptance of denigrating language that was directed at Plaintiff, conduct that Plaintiff claims violates his civil rights, excepts them from state-agent immunity. *Id.*

The Alabama Supreme Court has stated the test for State-agent immunity as follows:

"A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
(1) formulating plans, policies, or designs; or
(2) exercising his or her judgment in the administration of a department or agency of government, including but not limited to, examples such as:

> (a) making administrative adjudications;
> (b) allocating resources;
> (c) negotiating contracts;
> (d) hiring, firing, transferring, assigning, or supervising personnel; or
>
> (3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or
>
> (4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons; or
>
> (5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.
>
> Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity
>
> (1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
>
> (2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law."

*Ex parte Butts*, 775 So. 2d 173, 177-78 (Ala. 2000) (emphasis omitted) (quoting *Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000)); *see also* ALA. CODE § 36-1-12 (codifying the rule that governs State-agent immunity and is stated in *Ex parte Cranman*).

> [The Alabama Supreme Court] has established a "burden shifting" process when a party raises the defense of State-agent immunity. *Giambrone v. Douglas*, 874 So. 2d 1046, 1052 (Ala. 2003). In order to claim State-agent immunity, a State agent bears the burden of demonstrating that the plaintiff's claims arise from a function that would entitle the State agent to immunity. *Giambrone*, 874 So. 2d at 1052; *Ex parte Wood*, 852 So. 2d 705, 709 (Ala. 2002). If the State agent makes such a showing, the burden then shifts to the plaintiff to show that the State agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority. *Giambrone*, 874 So. 2d at 1052; *Wood*, 852 So. 2d at 709; *Ex parte Davis*, 721 So. 2d 685, 689 (Ala. 1998). "A State agent acts beyond authority and is therefore not immune when he or she 'fail[s] to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist.'" *Giambrone*, 874 So. 2d at 1052 (quoting *Ex parte Butts*, 775 So. 2d [at] 178 [ ]).

*Ex parte Estate of Reynolds*, 946 So. 2d 450, 452 (Ala. 2006).

"Willfulness" is the conscious doing of some act or omission of some duty under

> knowledge of existing conditions accompanied with a design or purpose to inflict injury. Instruction 29.01, <u>Alabama Pattern Jury Instructions-Civil</u> (2d ed. 1993); *see also Roe v. Lewis*, 416, So. 2d 750, 754 (Ala. 1982) (Willfulness "denotes an intention to cause an injury"). Similarly, malice is defined as "[t]he intent, without justification or excuse, to commit a wrongful act . . . ." BLACK'S LAW DICTIONARY, 968 (7th ed. 1999).

*Ex parte City of Montgomery*, 272 So. 3d 155, 168 n.5 (Ala. 2018) (internal quotation marks omitted) (quoting *Ex parte Nall*, 879 So. 2d 541, 546 (Ala. 2003)). "Bad faith" is a "[d]ishonesty of belief, purpose, or motive." *Bad Faith*, BLACK'S LAW DICTIONARY (11th ed. 2019).

As the Court discussed in its October 13, 2023 Memorandum Opinion and Order, USAHCM is entitled to state sovereign immunity pursuant to the Alabama Supreme Court's decision in *Autrey v. USA Health Care Management, LLC*, 380 So. 3d 1002 (Ala. 2022). As employees of USAHCM, Dr. Hutchens and Price are state agents and Defendants have shown the Plaintiff's claims arise from the use of their judgment in the administration of the anesthesia department at USA Health when they terminated Plaintiff's employment. The burden now shifts to Plaintiff to show Dr. Hutchens and Price acted willfully, maliciously, fraudulently, in bad faith, or beyond his authority. Given the Court found direct evidence of discrimination by Dr. Hutchens, the Court finds such conduct to be willful and malicious, and therefore, he is not entitled to state-agent immunity under a summary judgment standard. However, Plaintiff has not shown Price's conduct related to the March 30, 2021 termination falls within an exception to state-agent immunity since Plaintiff's argument as to such is based on circumstantial evidence and conjecture. Therefore, the Court finds Price is entitled to state-agent immunity. Despite the Court's finding that Price is entitled to state-agent immunity, it will analyze Plaintiff's state-law claims as to both Dr. Hutchens and Price.

### 2. Breach of Contract (Count 5)

Defendants argue Plaintiff cannot maintain his claim for breach of contract because Dr.

Hutchens and Price are not proper parties for such a claim.  Doc. 109 at 36.  Defendants argue, even if Dr. Hutchens and Price were parties to the contract, there was not a breach of the contract since Plaintiff was fired pursuant to the immediate termination provision of the employment agreement, Plaintiff was notified in writing of his termination, and Dr. Chang was consulted about the termination decision.  *Id.* at 36 n.41.

In response, Plaintiff argues Dr. Hutchens and Price acted beyond the scope of their authority as agents of their principal, USAHCM, when they unilaterally terminated Plaintiff and did not confer with Dr. Chang, the chief medical officer, before the termination.  Doc. 114 at 19.

Here, the employment agreement states it is between "[USAHCM] . . . and Jeffrey A. Planchard, M.D."  Doc. 106-1 at 225.  Dr. Hutchens, among others, signed the employment agreement on behalf of USAHCM.  *Id.* at 238.  "[A]gents cannot be held liable for a principal's breach of contract."  *Edwards v. Dothan City Schools*, 82 F.4th 1306, 1314 (11th Cir. 2023) (quoting *Harrell v. Reynolds Metals Co.*, 495 So. 2d 1381, 1389 (Ala. 1986)).  Plaintiff's contract was with USAHCM and not with the signatories in their individual capacities, who acted as USAHCM's agents.

Therefore, Plaintiff's breach-of-contract claim against Dr. Hutchens and Price fails, and Defendants' motion for summary judgment as to that claim is granted.

### 3.    Tortious Interference (Count 6)

Defendants argue Plaintiff cannot maintain his tortious interference claim because he cannot show Dr. Hutchens and Price were aware of a protectable business relationship, they interfered with his employment opportunities by taking specific actions, or he was damaged since he was employed within a few weeks after he was terminated from USAHCM then maintained employment.  Doc. 109 at 36-37.

In response, Plaintiff argues there is an inference of interference with his subsequent employment because Plaintiff was unable to secure relevant employment with a hospital within "one hundred miles of USA [Health]," the negative information about him that is alleged to have been disseminated likely came from an agent of USAHCM on behalf of Dr. Hutchens and Price, and Plaintiff suffered damage since the employment that he secured was lower-paying and forced him to separate from his family for extended periods. Doc. 114 at 19-20. Plaintiff also argues Dr. Hutchens and Price interfered with his employment agreement with USAHCM when they excluded Dr. Chang from discussions about Plaintiff's termination that preceded his March 30, 2021 termination. *Id.* at 21.

The elements of an intentional-interference-with-contractual-or-business-relations claim are "(1) the existence of a protectible business relationship; (2) of which the defendant knew; (3) to which the defendant was a stranger; (4) with which the defendant intentionally interfered; and (5) damage." *Ex part Hugine*, 256 So. 3d 30, 60 (Ala. 2017) (quoting *White Sands Grp., L.L.C. v. PRS II, LLC*, 32 So. 3d 5, 14 (Ala. 2009)).

Here, Plaintiff's theory that Dr. Hutchens and Price are liable for intentional interference with his prospective employment fails because he has not shown damage in that he has only produced speculation that he could not secure local employment because of alleged acts by Dr. Hutchens and Price and has not cited to a tangible event. As to Plaintiff's theory that Dr. Hutchens and Price intentionally interfered with Plaintiff's employment agreement with USAHCM, he did not allege such in his third amended complaint and cannot raise such a claim through argument in his response to the motion. *See Miccosukee Tribe of Indians of Fla. v. United States*, 716 F.3d 535, 559 (11th Cir. 2013) ("[A] plaintiff cannot amend his complaint through argument made in his brief in opposition to the defendant's motion for summary judgment." *Gilmour v. Gates,*

*McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004)).

Accordingly, Defendants' motion for summary judgment as to Plaintiff's tortious-interference claim is granted.

### 4.    Fraud (Count 7)

Defendants argue Plaintiff cannot maintain his fraud claim because there was no false representation since the employment agreement contained a provision for immediate termination that was invoked as part of Plaintiff's termination. Doc. 109 at 37-39. Further, Defendants argue Plaintiff has not shown Dr. Hutchens and Price intended to deceive Plaintiff since Price worked to secure Plaintiff's health insurance and could not have known Plaintiff would be terminated on March 30, 2021. *Id.*

In response, Plaintiff argues he has produced sufficient evidence to raise an inference of an intent to defraud. Doc. 114 at 21-22. Plaintiff argues Price promised him an employment contract before the holidays, but that did not occur so he secured a locum tenens assignment that Price then asked him to cancel due to a conflict with his schedule at USA Health, which likely affected Plaintiff's relationship with the locum tenens company that was involved. *Id.* Plaintiff argues, despite the presentation of the employment agreement, there was fraudulent conduct because the two-month trial period was not thereby terminated. *Id.* Plaintiff further argues Price's assurances that Plaintiff could cancel his health insurance one day before he was terminated demonstrates an intent to defraud him. *Id.*

> "A claim of promissory fraud is 'one based upon a promise to act or not to act in the future.'" *Ex parte Michelin N. Am., Inc.*, 795 So. 2d 674, 678 (Ala. 2001) (quoting *Padgett v. Hughes*, 535 So. 2d 140, 142 (Ala. 1988)).
>
>> "'The elements of fraud are (1) a false representation (2) of a material existing fact (3) reasonably relied upon by the plaintiff (4) who suffered damage as a proximate consequence of the misrepresentation. To prevail on a promissory fraud claim . . ., two

additional elements must be satisfied: (5) proof that at the time of the misrepresentation, the defendant had the intention not to perform the act promised, and (6) proof that the defendant had an intent to deceive.'"

*Michel N. Am.*, 795 So. 2d at 678-79 (quoting *Padgett*, 535 So. 2d at 142).

> "The burden is on the plaintiff to prove that when the promise was made the defendant intended to deceive. *Martin v. Am. Med. Int'l, Inc.*, 516 So. 2d 640 (Ala. 1987); *P & S Bus., Inc. v. S. Cent. Bell Tel. Co.*, 466 So. 2d 928 (Ala. 1985). The plaintiff cannot meet his burden merely by showing that the alleged promise ultimately was not kept; otherwise, any breach of contract would constitute a fraud. *Purcell Co. v. Spriggs Enters., inc.*, 431 So. 2d 515, 519 (Ala. 1983). It is well settled that 'a jury does not have untrammeled discretion to speculate upon the existence of [the requisite] intent [for promissory fraud].' There must be substantial evidence of a fraudulent intent that existed when the promise was made. *Martin*, 516 So. 2d at 642 (quoting *Purcell Co.*, 431 So. 2d at 519)."

*Goodyear Tire & Rubber Co. v. Washington*, 719 So. 2d 774, 776 (Ala. 1998); *see also Trum v. Melvin Pierce Marine Coating, Inc.*, 562 So. 2d 235, 237 (Ala. 1990) ("[I]n order for a promise to constitute a fraudulent misrepresentation, there must have been at the time the promise was made an intention not to perform, and such a promise must have been made with the intent to deceive."); *Clanton v. Bains Oil Co.*, 417 SO. 2d 149, 151 (Ala. 1982) ("A promise, to constitute fraud, must be made with the intent not to perform it."). Evidence of constitute, but unfulfilled promises can in some cases amount to substantial evidence of an intent to deceive. *Goodyear Tire*, 719 SO. 2d at 777; *Campbell v. Naman's Catering, Inc.*, 842 So. 2d 654, 659 (Ala. 2002). Additionally, "[a] defendant's intent to deceive can be established through circumstantial evidence that relates to events that occurred after the alleged misrepresentations were made." *Byrd v. Lamar*, 846 So. 2d 334, 343 (Ala. 2002). However, misrepresentations made recklessly or innocently will not sustain an action for promissory fraud. *Graham Foods*, 567 So. 2d at 862 ("Reckless misrepresentation will not support a charge of promissory fraud."), and *City of Prattville v. Post*, 831 So. 2d 622, 629 (Ala. Civ. App. 2002) (holding that, because promissory fraud required proof that the defendant did not intend to perform the act promised and had an intent to deceive, a claim of promissory fraud based on an implied or negligent representation "could not be sustained . . . .").

*Southland Bank v. A & A Drywall Supply Co., Inc.*, 21 So. 3d 1196, 1210, 1212 (Ala. 2008).

Here, Plaintiff was terminated pursuant to the immediate termination provision of his employment agreement and was provided a written notice of the reasons for his termination,

so any argument that he was misled as to whether the two-month trial period was still in effect is moot.  As to whether Price intended to deceive Plaintiff about his health insurance coverage, Plaintiff has not produced evidence sufficient to survive summary judgment.  Rather Plaintiff simply presents a theory his reasons for termination were pretextual.  Defendants have produced Price's email correspondence with human resources that show his affirmative steps to secure health insurance coverage for Plaintiff to begin on the anticipated start date of his permanent employment with USAHCM, April 1, 2021.  *See* FED. R. CIV. P. 56(e) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order.").

Accordingly, Defendants' motion for summary judgment as to Plaintiff's fraud claim is granted.

### 5.    Defamation/Libel/Slander (Count 8)

Defendants argue Plaintiff cannot maintain his claim of defamation, libel, or slander because the complained-of statements to prospective employers that he attributes to Dr. Hutchens and Price, he gave blood products to a Jehovah's Witness and he was removed from USA Health in shackles, cannot be proved to have been said by either of them, are contradicted by the witnesses who he cites, and cannot be reduced to admissible form at trial.  Doc. 109 at 39-40.

In response, Plaintiff argues, while he cannot produce direct evidence that shows either Dr. Hutchens or Price made false statements about him, there is circumstantial evidence that shows they are the likely origin of such statements.  Doc. 114 at 22-23.

> To establish a prima facie case of defamation, the plaintiff must show that the defendant was at least negligent, see *Mead Corp. v. Hicks,* 448 So.2d 308 (Ala.1983); *Restatement (Second) of Torts* § 558, § 580B (1977), in publishing a false and defamatory statement to another concerning the plaintiff, *Restatement (Second) of Torts* § 558, which is either actionable without having to prove special harm (actionable per se) or actionable upon allegations and proof of special harm (actionable per quod). *Restatement (Second) of Torts* § 558; see also *Albert Miller & Co. v. Corte,* 107 F.2d 432 (5th Cir.1939), cert. denied, *Corte v. Albert Miller & Co.,* 309 U.S. 688, 60 S. Ct. 890, 84 L. Ed. 1031 (1940).

*Nelson v. Lapeyrouse Grain Corp.,* 534 So.2d 1085, 1091 (Ala.1988) (footnote omitted).

> The foundation of an action for libel or slander is a malicious injury to reputation, and any false and malicious imputation of crime or moral delinquency by one published of and concerning another, which subjects the person to disgrace, ridicule, odium, or contempt in the estimation of his friends and acquaintances, or the public, with resulting damage to his reputation, is actionable either per se or per quod . . . .

> There is a distinction between actions of libel predicated on written or printed malicious aspersions of character, and actions of slander resting on oral defamation . . . . This distinction, however, is merely in respect to the question as to whether the imputed language or words are actionable per se.

> In cases of libel, if the language used exposes the plaintiff to public ridicule or contempt, though it does not embody an accusation of crime, the law presumes damage to the reputation, and pronounces it actionable per se.  While to constitute slander actionable per se, there must be an imputation of an indictable offense involving infamy or moral turpitude . . . .

> This distinction, however, does not deny the right to maintain an action for slander founded on oral malicious defamation subjecting the plaintiff to disgrace, ridicule, odium, or contempt, though it falls short of imputing the commission of such crime or misdemeanor.  In such case the law pronounces the words actionable per quod only, and the plaintiff must allege and prove special damages as an element of the cause of action.

*Ceravolo v. Brown,* 364 So.2d 1155, 1156–57 (Ala.1978) (quoting *Marion v. Davis,* 217 Ala. 16, 18, 114 So. 357, 358–59 (1927)).

*Butler v. Town of Argo*, 871 So. 2d 1, 16-17 (Ala. 2003).

Here, Plaintiff has not made out his prima facie case of defamation because he has not produced admissible evidence that shows either Dr. Hutchens or Price made the complained-of defamatory statements and relies in his argument solely on circumstantial evidence that is based on supposition and rumors.

Accordingly, Defendants' motion for summary judgments as to Plaintiff's defamation claim is granted.

### 6.    Intentional Infliction of Emotional Distress/Outrage (Count 9)

Defendants argue Plaintiff cannot maintain his claim of outrage because he has not presented sufficient evidence that shows Dr. Hutchens and Price made statements or acted to denigrate him aside from the derogatory slur that he alleges Dr. Hutchens made.  Doc. 109 at 40-41.

In response, Plaintiff argues a reasonable fact finder may determine, under the totality of the circumstances, the harm he suffered supports his outrage claim.  Doc. 114 at 23.

"[T]he tort of outrage is the same cause of action as intentional infliction of emotional distress." *Wilson v. Univ. of Ala. Health Servs. Found., P.C.*, 266 So. 3d 674, 675 n.1 (Ala. 2017) (quoting *Thomas v. Williams*, 21 So. 3d 1234, 1237 (Ala. Civ. App. 2008)).

> For a plaintiff to recover under the tort of outrage, she must demonstrate that the defendant's conduct (1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it.  *Green Tree Acceptance, Inc. v. Standridge*, 565 So. 2d 38, 44 (Ala. 1990).  The conduct complained of must "be so extreme in degree as to go beyond all possible bounds of decency and be regarded as atrocious and utterly intolerable in a civilized society." *Id.*

This Court has previously recognized the tort of outrage in three circumstances:

> "The tort of outrage is an extremely limited cause of action.  It is so

> limited that this Court has recognized it in regard to only three kinds of conduct: (1) wrongful conduct in the family-burial context, *Whitt v. Hulsey*, 519 So. 2d 901 (Ala. 1987); (2) barbaric methods employed to coerce an insurance settlement, *National Sec. Fire & Cas. Co. v. Bowen*, 447 So. 2d 133 (Ala. 1983); and (3) egregious sexual harassment, *Busby v. Truswal Sys. Corp.*, 551 So. 2d 322 (Ala. 1989). *See also* Michael L. Roberts and Gregory S. Cusimano, <u>Alabama Tort Law</u>, § 23.0 (2d ed. 1996)."

*Potts v. Hayes*, 771 So. 2d 462, 465 (Ala. 2000). . . . [T]his Court has <u>not</u> held that the tort of outrage can exist in <u>only</u> those three circumstances:

> "<u>That is not to say, however, that the tort of outrage is viable in only the three circumstances noted in *Potts*</u>. Recently, this Court affirmed a judgment on a tort-of-outrage claim asserted against a family physician who, when asked by a teenage boy's mother to counsel the boy concerning his stress over his parents' divorce, instead began exchanging addictive prescription drugs for homosexual sex for a number of years, resulting in the boy's drug addiction. *See O'Rear v. B.H.*, 69 So. 3d 106 (Ala. 2011). It is clear, however, that the tort of outrage is viable only when the conduct is "'so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society."' *Horne v. TGM Assocs., L.P.*, 56 So. 3d 615, 631 (Ala. 2010) (quoting [*American Road Service Co. v.*] *Inmon*, 394 So. 2d [361, 365 (Ala. 1980)])."

*Little v. Robinson*, 72 So. 3d 1168, 1172-73 (Ala. 2011) (emphasis added).

*Wilson*, 266 So. 3d at 676-77.

Here, as discussed, Plaintiff has not produced sufficient evidence to show either Dr. Hutchens or Price tortiously interfered with his prospective employment, perpetrated a fraud against him, or defamed him. Plaintiff has cited to the one instance when Dr. Hutchens used a derogatory slur to describe him to a co-worker as well as instances where he believes actions by either Dr. Hutchens or Price were motivated by discriminatory intent. However, the Court finds the use of a derogatory slur to refer to a plaintiff that is not directed at him, while deplorable, and instances that the plaintiff subjectively believes are motivated by discriminatory intent does not

rise to the level of conduct that is "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Wilson*, 266 So. 3d at 677 (citations omitted).

Accordingly, Defendants' motion for summary judgment as to Plaintiff's outrage claim is granted.

## VI.    CONCLUSION

Accordingly, the Motion to File Under Seal Certain Evidence in Support of Defendant's Motion for Summary Judgment (Doc. 103) is **DENIED**, and the **CLERK OF COURT** is **ORDERED** to **UNSEAL** Exhibits A, C, and D (Docs. 105-1, 105-3, 105-4) and **WITHDRAW** Exhibit B (Doc. 105-2) from the docket.

Defendants' Motion for Summary Judgment (Doc. 109) is **GRANTED in part and DENIED in part.**  The motion to for summary judgment (Doc. 109) is **GRANTED** as to the following:

(1)    (Count 3) retaliation pursuant to 42 U.S.C. § 2000e-3 against Defendant USA Healthcare Management, LLC, which is **DISMISSED with prejudice**, and

(2)    Plaintiff's state-law claims against Defendants Dennis Wade Hutchens, M.D., and Andrew Price, which include (Count 5) breach of contract, (Count 6) tortious interference with prospective business advantage, (Count 7) fraud, (Count 8) defamation/libel/slander, and (Count 9) intentional infliction of emotional distress/outrage and are **DISMISSED with prejudice**.

The motion for summary judgment (Doc. 109) is otherwise **DENIED**.

Based on the Court's ruling on the motion for summary judgment, the following claims remain:

- (Count 1) race discrimination pursuant to 42 U.S.C. § 2000e-2 against Defendant USA Healthcare Management, LLC, and

- (Count 2) religious discrimination pursuant to 42 U.S.C. § 2000e-2 against Defendant USA Healthcare Management, LLC.

- (Count 4) ethnic origin discrimination pursuant to 42 U.S.C. § 2000e-2 against Defendant USA Healthcare Management, LLC.

**DONE** and **ORDERED** this 7th day of February 2025.

/s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES DISTRICT JUDGE